

# NUMBER 13-22-00205-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE MATTER OF J.T.B., A CHILD.

### On appeal from the 377th District Court
### of Victoria County, Texas.

## MEMORANDUM OPINION

**Before Justices Longoria, Hinojosa, and Silva**
**Memorandum Opinion by Justice Hinojosa**

Appellant J.T.B.[1] was charged with delinquent conduct as a juvenile. By one issue, J.T.B. argues that the evidence was insufficient to support the juvenile court's waiver of jurisdiction. We affirm.

---

[1] *See* TEX. FAM. CODE ANN. § 56.01(j) (setting forth that "neither the child nor his family shall be identified in an appellate opinion rendered in an appeal or habeas corpus proceedings related to juvenile court proceedings under this title" and that the appellate opinion shall identify "the child by his initials only").

## I.    BACKGROUND

J.T.B. was charged with murder and felony murder. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (3); TEX. FAM. CODE ANN. § 53.04. On March 17, 2022, the State filed its Petition for Discretionary Transfer to Criminal Court, requesting that proceedings against J.T.B. be transferred from juvenile court to an adult criminal district court. *See* TEX. FAM. CODE ANN. § 54.02 (providing that "the juvenile court may waive its exclusive original jurisdiction and transfer a child to the appropriate district court or criminal district court for criminal proceedings" if certain statutory requirements are met).

At the discretionary transfer hearing, the State presented three witnesses. We summarize each witness's testimony in turn.

### A.    Detective Shane Wesley Collins

Detective Collins, an eight-year veteran of the Victoria Police Department, testified that he and fellow officers responded to a "shots fired" call at the 1100 block of Lova Drive in Victoria, Texas on February 19, 2022. The caller relayed that she believed she had been shot because she had blood behind her head. When officers arrived, they found Tinasha Upton lying on the pavement and unresponsive. Upton was surrounded by her three sons, D.W., E.W., and K.W. Upton was later pronounced dead.

Officers briefly interviewed Upton's sons. The brothers mentioned that they were coming from a carnival at a community center where D.W. had gotten into an altercation with J.T.B. and another young male, later identified as D.C. D.W. and J.T.B. had been in a school fight two weeks before. D.W. reported that at the carnival, J.T.B. had a ski mask, a gun in his waistband, and that he and D.C. tried to lure D.W. and his brothers to a darker

2

area of the carnival. The brothers refused to engage.

Officers learned that another child, J.B., was in Upton's vehicle at the time of the shooting. J.B. was a friend of the brothers: Upton was giving him a ride home from the carnival. J.B.'s version of what occurred was similar to what the brothers told the officers.

Officers obtained a last known residential address for J.T.B. They visited the residence and spoke with J.T.B.'s father (Father). Father told officers that J.T.B. was at a friend's house. Father drove to J.T.B.'s friend's house in his own vehicle; officers followed. After picking up J.T.B. from his friend's house, Father drove him to the juvenile detention center; officers again followed. After J.T.B. was magistrated[2], he provided a statement to authorities. J.T.B. stated that after leaving the carnival, he and D.C. went to pick up some friends at a four-way stop. At the stop, J.T.B. stated that they "coincidentally" saw the vehicle that D.W., E.W., and K.W. were in. J.T.B. stated that he and his friends followed that vehicle, and D.C. later fired shots at their car. J.T.B. claimed he did not shoot anyone.

Detective Collins testified that he was skeptical about J.T.B.'s statement because it seemed self-serving; he doubted that J.T.B.'s discovery of Upton's vehicle was a "coincidence." Detective Collins believed at this point, though, that he had enough probable cause to charge J.T.B. with murder on the law of the parties.[3] As Detective Collins began to prepare his arrest report, another officer conducted a gunshot residue

---

[2] *See* TEX. FAM. CODE ANN. § 52.02(a)(2) (providing that "a person taking a child into custody, without unnecessary delay and without first taking the child to any place other than a juvenile processing office . . . shall . . . bring the child before the office or official designated by the juvenile board if there is probable cause to believe that the child engaged in delinquent conduct").

[3] Texas law "allows individuals to be charged as a party to an offense and to be held criminally responsible for the conduct of another when that individual acts in concert with another person in committing an offense." TEX. PENAL CODE ANN. §§ 7.01, 7.02.

test of J.T.B.'s hands. At that time, J.T.B. was informed that he was being arrested and charged with murder.

Detective Collins was about to re-enter the interrogation room when Father came out of the room with tears in his eyes, stating that J.T.B. admitted to him that he shot at the vehicle too. J.T.B. was then "re-magistrate[d]" and gave a second statement. This time, J.T.B. admitted that he and his friends went to the carnival to wait for Upton's sons to get picked up by their mother. After the brothers were in Upton's Expedition, J.T.B. and friends followed Upton until she turned onto Lova Drive. J.T.B. stated that once Upton made a U-turn and drove towards them, D.C. leaned out of the driver's side window and fired his gun, a .40 caliber Taurus G2C. J.T.B. then stuck his arm out of the vehicle, "raised his hand above his head and above the roof of the car" and fired his gun—a black 9-millimeter Taurus—twice.

Detective Collins stated that footage obtained from a residential Ring doorbell camera corroborated J.T.B.'s second statement. Detective Collins further testified that shell casings were found where the Expedition had stopped—one 9-millimeter shell casing and four .40 shell casings. Detective Collins stated that authorities believed that two gunshots "went through the back passenger [door] on the left side" and "one ultimately struck" Upton. Detective Collins confirmed that no firearms were found during the investigation of this case.

## B. Karan Redus, Ph.D.

Karan Redus, Ph.D., a board-certified psychologist with over thirty years of experience, analyzed J.T.B. "[t]o assist the [c]ourt in determining whether a juvenile will

4

be tried in the juvenile system or transferred to adult criminal court." Dr. Redus informed the court that she has worked exclusively with juvenile offenders since 2005.

Dr. Redus first met J.T.B. on April 1, 2022. She testified that she explained to him the purpose of her evaluation and the importance of him telling the truth. Dr. Redus performed four examinations on J.T.B.: (1) the Reynolds Intellectual Screening Test; (2) the Minnesota Multiphasic Personality Inventory for adolescents; (3) the Jesness Inventory-Revised; and (4) the Risk-Sophistication Inventory. To complete her evaluation, Dr. Redus also reviewed J.T.B.'s offense report and records from Victoria County's juvenile probation office, and conducted a phone interview with Father. She described J.T.B. as polite, though "sad" and "anxious," during her evaluations. She testified that J.T.B. acknowledged guilt and remorse for his actions during their interaction.

Dr. Redus first explained that the Reynolds test measures overall general intellectual ability. The average score on this diagnostic tool is 100, and 15 points above or below "would be considered significantly above or significantly below average on a test." She relayed that J.T.B. scored a 91, which she testified was in the average range and where she believed the "majority of people his age would score."

Dr. Redus then testified about J.T.B.'s results from the Minnesota personality test, which is a written questionnaire that measures a broad range of emotional and behavioral issues. Dr. Redus stated that J.T.B. did not have any scores in a "significant" range, but explained that his responses were elevated on scales that measured defensiveness. She opined that this indicated that J.T.B. "could be someone who is concerned about attempting to present themselves in a positive light and [will] not admit to anything they

5

think would put them in a bad light."

Regarding the Jesness Inventory-Revised test, Dr. Redus testified that this written questionnaire is designed to help identify "different characteristics of juveniles who are in a correctional setting." She explained that J.T.B.'s results revealed that he "might tend to follow rules out of insecurity" and that "he might be somewhat susceptible to influence by peers." She elaborated that J.T.B. might see "the world in terms of power and control and is somewhat concerned about trying to maintain some control over his situation."

Finally, Dr. Redus discussed J.T.B.'s results from the Risk-Sophistication Treatment Inventory. This exam is a "semi-structured interview instrument" designed to measure elements identifying sophistication, maturity, risk of dangerousness, and amenability to treatment. Dr. Redus relayed that J.T.B.'s score on "planned or extensive history of criminality and psychopathic features" was low and his score on "violent and aggressive tendencies" was in the middle range—elevated due to his admission that he had discharged a firearm. J.T.B.'s sophistication and maturity scores were also in the "middle range," indicating that he "was developing some self-esteem[], beginning to know himself as a person," and "present[ing] as having some awareness that he was making decisions on his own." His cognitive capacity range was "lower." Dr. Redus testified that J.T.B.'s "treatment ability scale" was in the high range—signaling that he was someone who was responding with an openness to treatment.

Dr. Redus testified that J.T.B.'s primary diagnosis was "conduct disorder," which reflects someone who is engaged in threatening or oppositional behavior that can harm or threaten someone. Based on her evaluation, Dr. Redus believed that there was some

risk for J.T.B. to exhibit dangerousness in the future. She recommended long-term treatment of at least six months given J.T.B.'s age so that he could develop better cognitive decision-making skills.

## C.     Theresa Haywood

Theresa Haywood, a probation officer with the Victoria County Juvenile Services, testified that J.T.B. was "kind of shy and reserved, but cooperative and polite" when she met him at the detention center. She stated that J.T.B. tested positive for marijuana at intake. She also reported that J.T.B. had four prior referrals to juvenile services before his murder charge: on March 19, 2021, J.T.B. received referrals for engaging in criminal activity, tampering with identification numbers, evading arrest with a vehicle, and evading arrest. He was placed on deferred prosecution for these charges.

Haywood testified that J.T.B. violated several conditions of his deferred prosecution. For example, he (1) committed a new offense against the law with the murder charge; (2) was in a previous school fight with D.W.; and (3) continued to socialize with other probationers such as D.C., whom Haywood identified as a "known gang member." She noted that D.C. was also arrested at the same time J.T.B. was arrested for his prior felony evading arrest with a vehicle on March 19, 2021, and that the youths were admonished from associating together.

Haywood testified that since J.T.B. has been in detention, he received five minor incident reports and one major report. Over objection, she also testified that in her opinion, neither Victoria County nor the Texas Juvenile Justice Department (TJJD) had "the resources needed for [J.T.B.] to be rehabilitated within the community." She elaborated

7

that these resources "are geared towards short-term types of rehabilitation, and it's just—it is not appropriate for the gravity of the offense committed." She recommended to the court that J.T.B. "be certified as an adult and that the case be transferred to the appropriate criminal district court for criminal proceedings."

The trial court granted the State's petition to transfer. In its order waiving jurisdiction, the court found as follows:

> The Court finds that [J.T.B.] was born on the . . . day of August, 2006,[4] and was 15 years of age on the date of the alleged offense.
>
> All parties having announced ready, this Court conducted a full investigation as required by [§] 54.02(a)(3), Texas Juvenile Justice Code. Among others, this Court considered the following matters: (1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person; (2) the sophistication and maturity of the Child; (3) the record and previous history of the Child; and (4) the prospects of adequate protection of the public and the likelihood of rehabilitation of the child by use of procedures, services[,] and facilities currently available to the juvenile court.
>
> After conducting such full investigation, including evidence and argument of counsel, the Court finds that the welfare of the community requires criminal proceedings, because of the seriousness of the offense and background of the Child and that there is probable cause to believe that the Child committed the offense of Murder ([§] 19.02 of the Penal Code of Texas) as alleged in the State's Original Petition for Discretionary Transfer to Adult Criminal Court, and that this Court waive its exclusive, original jurisdiction of this cause as to the Child and felony offense alleged in the State's Original Petition For Discretionary Transfer To Adult Criminal Court, said felony offense reading as follows: That on or about the 19th day of February, A.D. 2022, in the County of Victoria and State of Texas, said Child violated a penal law of this State punishable by imprisonment, to-wit: [§] 19.02, of the Penal Code of the State of Texas, in that [J.T.B.] did then and there, intentionally and knowingly cause the death of an individual, namely Tinasha Lashaun Upton, by shooting Tinasha Lashaun Upton in the head with a firearm.

---

[4] We omit J.T.B.'s birthdate for privacy reasons.

8

In addition, [t]hat on or about the 19th day of February, A.D. 2022, in the County of Victoria and State of Texas, said Child violated a penal law of this State punishable by imprisonment, to-wit: [§] 19.02, of the Penal Code of the State of Texas, in that [J.T.B.] did then and there, commit or attempt to commit and act clearly dangerous to human life, namely shooting a firearm at or in the direction of a moving vehicle with a driver and passengers inside said vehicle, that caused the death of Tinasha Lashaun Upton, hereafter styled the complainant, and [J.T.B.] was then and there in the course of intentionally and knowingly committing a felony, namely deadly conduct by Discharge of a Firearm, and the death of the complainant was caused while [J.T.B.] was in the course of and in furtherance of the commission or attempt of the felony.

This Court is hereby waiving its exclusive, original jurisdiction for the following reasons: the offense was against a person; the Child knows right from wrong and that his actions were not the result of his failure to understand the rules of society and the consequences of violating those rules; the prospect of adequate protection of the public and likelihood of rehabilitation of Child by the use of procedures, services[,] and facilities currently available through juvenile court is unlikely.

J.T.B. appeals. *See* TEX. FAM. CODE ANN. §§ 54.02, 56.01(c)(1)(a).

## II. APPLICABLE LAW

"A juvenile certification hearing is not a trial on the merits." *See State v. Lopez*, 196 S.W.3d 872, 874 (Tex. App.—Dallas 2006, pet. ref'd) (citing *In re P.A.C.*, 562 S.W.2d 913, 915 (Tex. App.—Amarillo 1978, no writ)). The purpose of the transfer proceeding is not to determine the guilt or innocence of a juvenile, but to establish whether the best interests of the juvenile and of society would be served by maintaining juvenile custody of the child or by transferring the child to criminal district court for adult proceedings. *See In re D.I.R.*, 650 S.W.3d 172, 179 (Tex. App.—El Paso 2021, no pet.).

"A juvenile court may waive its exclusive original jurisdiction and transfer a juvenile case to the appropriate district court for criminal proceedings if certain statutory and constitutional requirements are met." *Ex parte Thomas*, 623 S.W.3d 370, 372 (Tex. Crim.

9

App. 2021). Specifically, § 54.02(a) of the Texas Family Code allows a juvenile court to waive its exclusive original jurisdiction and transfer a child to the appropriate district court or criminal district court for criminal proceedings if:

> (1)    the child is alleged to have violated a penal law of the grade of felony;
>
> (2)    the child was:
>
> > (A)    14 years of age or older at the time he is alleged to have committed the offense, if the offense is a capital felony, an aggravated controlled substance felony, or a felony of the first degree, and no adjudication hearing has been conducted concerning that offense; or
> >
> > (B)    15 years of age or older at the time the child is alleged to have committed the offense, if the offense is a felony of the second or third degree or a state jail felony, and no adjudication hearing has been conducted concerning that offense; and
>
> (3)    after a full investigation and a hearing, the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense alleged or the background of the child the welfare of the community requires criminal proceedings.

TEX. FAM. CODE ANN. § 54.02(a).

The statute also sets forth that, in making the determination, the court shall consider the following factors:

> (1)    whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
>
> (2)    the sophistication and maturity of the child;
>
> (3)    the record and previous history of the child; and
>
> (4)    the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

10

*Id.* § 54.02(f). These factors are non-exclusive and assist the juvenile court in balancing the juvenile offender's potential danger with his "amenability to treatment." *Bell v. State*, 649 S.W.3d 867, 886 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (quoting *In re C.O.*, No. 02-21-00235-CV, 2021 WL 5933796, at *5 (Tex. App.—Fort Worth Dec. 16, 2021, pet. denied) (mem. op.)). "Any combination of these factors may suffice to support a waiver of the juvenile court's exclusive original jurisdiction and not every factor need weigh in favor of transfer to the criminal district court." *Id*. The juvenile court is not required to find that the evidence establishes each factor, nor does it need to consider other factors. *Id.* at 886–87; *see also In re Z.M.*, No. 02-21-00213-CV, 2021 WL 4898851, at *1 (Tex. App.—Fort Worth Oct. 21, 2021, no pet.) (mem. op.). The factors are merely guiding elements to determine whether grounds for transfer exist. *Bell*, 649 S.W.3d at 887.

### III. STANDARD OF REVIEW

An appellate court uses a two-part analysis to review a juvenile court decision to waive its exclusive original jurisdiction and transfer a case to a criminal district court. *See Bell*, 649 S.W.3d at 887. First, the court must "review the juvenile court's findings using the traditional evidentiary sufficiency review." *Id.*; *see also In re C.C.C.*, No. 13-21-00371-CV, 2022 WL 710143, at *8 (Tex. App.—Corpus Christi–Edinburg Mar. 10, 2022, no pet.) (mem. op.). "In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the juvenile court's findings and disregard contrary evidence unless a reasonable fact finder could not reject it." *Bell*, 649 S.W.3d at 887. The evidence is legally sufficient if there is more than a scintilla of evidence to support the findings. *Id.* When conducting a factual-sufficiency review, "we consider all the evidence presented to

11

determine if the juvenile court's findings conflict with the great weight and preponderance of the evidence so as to be clearly wrong or unjust." *Id.*; *see also In re C.C.C.*, 2022 WL 710143, at *8.

Only if we determine that the juvenile court's findings are supported by legally and factually sufficient evidence, do we then review the juvenile court's ultimate waiver decision for an abuse of discretion. *Bell*, 649 S.W.3d at 887. A juvenile court abuses its discretion if it acts without reference to any guiding rules and principles. *In re Nat'l Lloyds Ins., Co.*, 507 S.W.3d 219, 226 (Tex. 2016) (orig. proceeding) (per curiam); *see also In re C.C.C.*, 2022 WL 710143, at *8. "A juvenile court abuses its discretion when its transfer decision is essentially arbitrary, given the evidence upon which it was based." *Bell*, 649 S.W.3d at 887. However, "a waiver decision representing a reasonably principled application of the legislative criteria generally will pass muster under the abuse-of-discretion standard of review." *Id*. (cleaned up). "An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence." *In re B.N.F.*, 120 S.W.3d 873, 877 (Tex. App.—Fort Worth 2003, no pet.).

The juvenile court is the sole factfinder in a transfer hearing and may choose to believe or disbelieve any of the witnesses' testimony. *See Grant v. State*, 313 S.W.3d 443, 444–45 (Tex. App.—Waco 2010, no pet.) (citing *In re D.W.L.*, 828 S.W.2d 520, 524 (Tex. App.—Houston [14th Dist.] 1992, no writ)).

## IV.   ANALYSIS

By his sole issue, J.T.B. contends the evidence was insufficient to support the juvenile court's waiver of jurisdiction under § 54.02(f) of the Texas Family Code. Because

12

J.T.B. concedes that the alleged offense is against a person, which weighs in favor of jurisdictional waiver, we analyze the remaining elements of subsection (f) in turn. *See* TEX. FAM. CODE ANN. § 54.02(f)(1) (noting that the first factor courts consider in a waiver decision is "whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person").

## A.      Sophistication and Maturity

J.T.B. contends that the evidence was insufficient to establish that he was sophisticated or mature enough for the juvenile court to waive its jurisdiction. *See id.* § 54.02(f)(2). J.T.B. first complains that neither the trial court's written or oral findings "reference any of the relevant testimony, either for or against its holding, from Dr. Redus or Ms. Haywood." The Texas Court of Criminal Appeals, however, has recently held that lack of "factually-supported, case-specific findings" will not make an order waiving jurisdiction invalid. *See Ex parte Thomas*, 623 S.W.3d at 372.

J.T.B. next contends that Dr. Redus described him as a "typical adolescent" and that "[n]o information was obtained on whether or not J.T.B. understood court proceedings or if he understood or was aware that there are different consequences in the juvenile system compared to the adult justice system." Evidence that the child understands the seriousness of the charge against him as well as the proceedings support a juvenile court's finding that the child's sophistication and maturity weigh in favor of transfer. *Rodriguez v. State*, 478 S.W.3d 783, 787 (Tex. App.—San Antonio 2015, no pet.). The record shows that Dr. Redus did not attempt to explain the difference between juvenile and criminal court to J.T.B. However, when Dr. Redus was asked whether J.T.B.

13

understood why she was evaluating him, she responded, "[t]o determine whether he was going to adult court or be tried as a juvenile."

Dr. Redus also testified that J.T.B.'s Reynolds test measured his general intellectual ability at 91 out of 100, which was average and "where the majority of people his age would score." She stated that J.T.B.'s Minnesota personality test results were elevated on the scales that measured defensiveness. Further, J.T.B.'s scores on Jesness Inventory-Revised questionnaire revealed that J.T.B.'s "history of criminality and psychopathic features" was low and his score on "violent and aggressive tendencies" was elevated due to his admission that he had discharged a firearm. J.T.B.'s sophistication and maturity scores were also in the "middle range," while his cognitive capacity range was "lower." Finally, Dr. Redus testified that J.T.B.'s "treatment ability scale" was high and indicated that he was someone who was open to treatment.

The record showed that J.T.B. had average intelligence and understood why he was being evaluated by Dr. Redus. We conclude that there is more than a scintilla of proof supporting that juvenile court's finding that J.T.B. was sophisticated and mature enough to understand the consequences of the waiver proceedings. *See Bell*, 649 S.W.3d at 887; *see also In re C.C.C.*, 2022 WL 710143, at *8. We further hold that the great weight and preponderance of the evidence is not contrary to that holding. *See Bell*, 649 S.W.3d at 887.

## B. The Juvenile's Record and Previous History

J.T.B. next argues that his criminal record and previous history did not warrant waiver of juvenile jurisdiction. *See* Tex. Fam. Code Ann. § 54.02(f)(3). The record,

however, provides evidentiary support for the juvenile court's findings on this point. Haywood testified that J.T.B. was already in the juvenile probation system when he was arrested for Upton's murder: a year before, he had received four referrals for engaging in criminal activity, tampering with identification numbers, evading arrest with a vehicle, and evading arrest. Haywood testified that J.T.B. was given deferred prosecution for these charges.

Haywood also testified that J.T.B. violated several conditions of his deferred adjudication. For example, he (1) committed a new offense against the law with the murder charge; (2) was in a previous school fight; and (3) continued to socialize with D.C., a "known gang member." Haywood also stated that J.T.B. tested positive for marijuana at intake. Further, although she described J.T.B. as "kind of shy and reserved" and "cooperative and polite," she also reported that J.T.B. has received five minor incident reports and one major report since he has been in detention. "[T]he juvenile court may consider . . . rule infractions while the child is in the juvenile detention facility following the commission of the offense in determining whether the child's record and previous history weigh in favor of transfer." *Bell*, 649 S.W.3d at 895.

Considering the record, we conclude that there is a scintilla of proof supporting the juvenile court's finding that J.T.B.'s criminal record and previous history justify a waiver of the juvenile court's jurisdiction, and that the great weight and preponderance of the evidence is not contrary to that holding. *See id.*; *see also In re C.C.C.*, 2022 WL 710143, at *8.

**C.       Protection of the Public and Likelihood of Rehabilitation**

Finally, J.T.B. asserts that the public will remain safe, and that the likelihood of his rehabilitation is high, if he remains in the juvenile court system. *See* TEX. FAM. CODE ANN. § 54.02(f)(4). J.T.B. cites testimony from Dr. Redus that J.T.B.'s Risk-Sophistication Treatment Inventory results demonstrated that his "treatment ability scale" score indicated that he was someone who was open to treatment. Dr. Redus also testified that a minimum of six months of treatment would help J.T.B. develop better cognitive decision-making as "he did show guilt and remorse." J.T.B. contends that "[t]he public and its safety would not be an issue during this treatment period."

However, Haywood testified over objection that she did not believe either Victoria County or the TJJD had "the resources needed for [J.T.B.] to be rehabilitated within the community." Haywood stated that these resources "are geared towards short-term types of rehabilitation" and that they were not appropriate for the gravity of the murder offense committed. She recommended to the court that J.T.B. "be certified as an adult and that the case be transferred to the appropriate criminal district court for criminal proceedings."

We conclude that there is more than a scintilla of evidence supporting the juvenile court's decision to waive jurisdiction on this issue, and the great weight and preponderance of the evidence is not contrary to this holding. *See Bell*, 649 S.W.3d at 887; *see also In re C.C.C.*, 2022 WL 710143, at *8.

**D.       Conclusion**

Because "[a]ny combination of these factors may suffice to support a waiver of the juvenile court's exclusive original jurisdiction and not every factor need weigh in favor of

16

transfer," we conclude the juvenile court's findings were supported by the evidence. *See Bell*, 649 S.W.3d at 887. Although the juvenile court was not required to find evidence to support each factor, in this case, it did. *Id.* at 886–87.

Further, we cannot say that the trial court's decision was arbitrary or not based on guiding rules and principles. *See id.* at 887. Upton was shot and killed while driving her young sons and their friend home from a carnival; this offense against a person, in addition to the other evidence offered by the State, weighs heavily in support of the trial court's decision. *See* TEX. FAM. CODE ANN. § 54.02(a). Accordingly, we hold that the trial court did not abuse its discretion in waiving its jurisdisction. *See Bell*, 649 S.W.3d at 887.

## V.    CONCLUSION

We affirm the juvenile court's judgment.

LETICIA HINOJOSA
Justice

Delivered and filed on the
13th day of October, 2022.

17