

# IN THE
# TENTH COURT OF APPEALS

### No. 10-08-00393-CR

**JAMES MICHAEL GRANT,**

**Appellant**

**v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the 52nd District Court
Coryell County, Texas
Trial Court No. FAM-08-19310**

# O P I N I O N

James Michael Grant, II, pled guilty to the offense of Murder. TEX. PENAL CODE ANN. § 19.02 (Vernon 2003). He was sentenced by the court to 45 years in prison. He now appeals. Because the juvenile court did not abuse its discretion in waiving its jurisdiction and transferring Grant to criminal court, because the trial court did not err in denying his motion to suppress his statement, and because Grant's constitutional challenge was not preserved, we affirm the trial court's judgment.

## JUVENILE TRANSFER HEARING

In his first and third issues on appeal, Grant challenges the juvenile court's decision to waive its jurisdiction and transfer Grant to criminal court. We review those issues first.

When the State requests a transfer, the juvenile court is required to conduct a hearing without a jury to consider the transfer of a juvenile for criminal proceedings. TEX. FAM. CODE ANN. § 54.02 (b), (c) (Vernon Supp. 2009). Before the hearing, the court is required to order and obtain a complete diagnostic study, social evaluation, and full investigation of the juvenile, his circumstances, and the circumstances of the alleged offense. *Id*. § 54.02(d). A juvenile court may then waive its jurisdiction and transfer the juvenile to criminal court if, after a full investigation and a hearing, the court determines there is probable cause to believe that the juvenile committed the offense alleged and that because of the seriousness of the offense or the background of the child, the welfare of the community requires criminal proceedings. *Id*. § 54.02(a)(3).

The juvenile court can determine probable cause in a nonadversary preliminary hearing through the use of hearsay besides written and oral testimony. *In re D.W.L.*, 828 S.W.2d 520, 524 (Tex. App.—Houston [14th Dist.] 1992, no writ). The court does not determine the juvenile's innocence or guilt at the hearing, but merely evaluates whether he should be tried as a juvenile or adult in subsequent proceedings. *Id*. at 524-525. The trial court is the sole factfinder in a transfer hearing and may choose to believe or disbelieve any or all of the witnesses' testimony. *Id*. at 525.

Under Article 44.47 of the Texas Code of Criminal Procedure, an appeal from a juvenile court's decision to certify a juvenile as an adult and to transfer the case to criminal court under section 54.02 of the Texas Family Code is a criminal matter. Tex. Code Crim. Proc. Ann. art. 44.47(a), (c) (Vernon 2006). A challenge to the certification and transfer order can be made only in conjunction with the appeal of a conviction of or an order of deferred adjudication for the offense for which the defendant was transferred to criminal court. *Id*. at art. 44.47(b). The juvenile court's decision to transfer a case to district court is reviewed for abuse of discretion. *McKaine v. State*, 170 S.W.3d 285, 289 (Tex. App.—Corpus Christi 2005, no pet.); *Faisst v. State*, 105 S.W.3d 8, 12 (Tex. App.—Tyler 2003, no pet.).

*Probable Cause*

Grant first challenges the juvenile court's finding of probable cause to believe Grant committed the offense of murder. Specifically, Grant challenges the sufficiency of probable cause to believe Grant committed murder as a party.[1]

Probable cause consists of sufficient facts and circumstances to warrant a prudent person to believe that the suspect committed the offense. *In re K.B.H.*, 913 S.W.2d 684, 689 (Tex. App.—Texarkana 1995, no pet.); *In re D.W.L.*, 828 S.W.2d 520, 524 (Tex. App.—Houston [14th Dist.] 1992, no writ). A person commits an offense as a

---

[1] Grant actually challenges the factual sufficiency of the evidence citing to case law which used the civil standard for factual sufficiency of the evidence as a review for a probable cause determination and was decided prior to the change in the Family Code and Code of Criminal Procedure which made the appeal of a transfer hearing a criminal matter. Because we believe the review of the probable cause determination necessarily encompasses a review of all the evidence presented at the transfer hearing, as in any other probable cause analysis, we will utilize the same standard of review for probable cause in this circumstance that we would to determine probable cause for any other purpose. *See In re D.W.L.*, 828 S.W.2d 520, 524 (Tex. App.—Houston [14th Dist.] 1992, no writ).

party if acting with intent to promote or assist the commission of an offense; he solicits, encourages, directs, aids, or attempts to aid another person to commit an offense. *See* TEX. PENAL CODE ANN. § 7.02(a)(2) (Vernon 2003).

*Facts developed at the hearing*

In the early morning of September 15, 2007, the body of James Michael Grant (Michael), the father of appellant Grant, was found lying in a bar ditch a few feet from his pickup. Michael was wrapped in bed linens and tied with coax cables and yellow nylon ropes. His body had been stabbed multiple times in the chest and stomach area. Michael was wearing only boxer shorts and was covered in blood. The tailgate of his pickup was down. Because it appeared to investigators that Michael had been killed somewhere else and dumped in the bar ditch, the investigation was moved to Michael's house.

Michael's master bedroom looked like it had been ransacked. All of the drawers had been pulled out of the dresser. The bed sheets had been taken off of the bed. Blood was splattered on the wall, the bed, and the carpet. The garage door was open and there were no signs of a forced entry. A large comforter soaked in blood was on top of either the washer or the dryer. Blood was on the doorway leading out into the garage, on the garage floor, and on the driveway.

Jesus Ramos, a Texas Ranger investigating the murder, was told by Michael's father, Garnett, that the relationship between Grant and Michael was bad.

Ramos and Ricky Helms, an investigator with the Coryell County Sheriff's Department, initially spoke with Grant during the evening of September 15th. Grant

told Ramos he was at home asleep at the time of the murder. He stated he went to bed at about 11:30 p.m. and slept through the night. Although Grant's room was across the house from Michael's room, it was a very small house. Grant stated to Ramos that Michael sold drugs and that Grant believed someone had killed Michael. Grant denied hearing any commotion in the house.

Ramos noticed during the interview that there was "a lot of hate" in Grant and that Grant was not emotional or distraught that his father had been killed. Ramos also thought Grant had a cocky attitude. While Ramos was questioning Grant, Grant would not answer a question until the next question was asked, as if Grant was stalling. When Ramos continued with his questions, Grant became upset. He pointed his finger at Ramos and told Ramos not to interrupt him. Grant affirmed that he and Michael had a physical altercation in the past. When asked if he could "take" his father, Grant was very confident and cocky, stating he could hold his own. During the interview, Ramos got the impression that Grant was intentionally attempting to be manipulative or deceitful. When Grant left the room to go to the bathroom during the interview, he grabbed the door handle using his t-shirt. Ramos thought Grant was trying to prevent him from acquiring Grant's fingerprints.

After the interview with Grant, Ramos searched Megan Lewis's house with her consent. Megan was Grant's mother and Michael's ex-wife. Grant was present at the time of the search. Both Megan and Grant acted strange. They were not distraught about Michael's death. They were laughing and having a good time, making strange

comments. Grant commented that if all he lost that day was his boots, because they had been taken to be compared to bloody footprints, then it was a good day.

John Hopkins, Megan's boyfriend, was the first person arrested for Michael's murder.[2] One day, after the murder and after drinking, Hopkins put a gun to his head. At one point, Hopkins pointed the gun at Grant to get him to "back off." Megan and Grant called 911. On the recording, Megan and Grant were both trying to talk Hopkins out of committing suicide. Grant was pleading with Hopkins not to kill himself. Grant was crying, and toward the end of the recording, Grant told Hopkins that he loved him. Ramos found Grant's reaction to Hopkins's suicide attempt strange because Grant had not given that same emotion about Michael's death.

By the time police arrived, Hopkins had left the house. Megan directed the police to a suicide note left by Hopkins. The note implicated only Hopkins in Michael's murder. But when interviewed after his arrest, Hopkins confessed to his involvement in the murder and implicated both Grant and Megan.

Hopkins stated in his confession that Megan wanted Hopkins to kill Michael so that she could gain custody of her children. He initially thought Megan was crazy but became so romantically involved with her that he wanted to please her. Hopkins stated that he asked Grant what he would think if Hopkins killed Michael. Grant replied that Hopkins would be a king in their eyes, referring to Grant and Megan. After that, Hopkins decided to kill Michael and told Megan of his decision. Hopkins said he placed a call to Grant and told Grant he was going to kill Michael and needed the back

---

[2] Hopkins had at some point prior to the murder been in prison in either New Jersey or Pennsylvania for a sex offense with a minor female.

door unlocked so that Hopkins could enter the house. Grant was to call Hopkins when Michael fell asleep. Grant complied and let Hopkins into Michael's bedroom. Hopkins told Grant to leave the room. Grant stood in the living room and watched while Hopkins began stabbing Michael. Afterwards, Grant came in the room, and Hopkins handed him the knife. Hopkins walked out of the room and heard Grant make statements such as, "You deserved that, you son of a bitch." Hopkins walked back to the room and found that Michael's body had been removed from the bed and saw Grant stomping on Michael's chest. Hopkins also stated that once the body was loaded into the pickup, he and Grant went back in the house and ransacked it. Then they dumped the body in a bar ditch.

Cellular telephone records showed that a call was made from Hopkins's phone to Grant's phone at 7:31 p.m. on September 14th. Another call was made from Hopkins's phone to Grant's phone at 11:35 p.m. Calls from Grant's phone to Hopkins's phone were made at 11:45 p.m. and 11:58 p.m. on the 14th, and then at 12:39 a.m., 1:21 a.m., 1:50 a.m., 2:13 a.m., 2:15 a.m., and 2:25 a.m. on the 15th of September. There is a call from Michael's phone to Grant's phone at 1:13 a.m. on the 15th as well.

After Hopkins' confession, warrants were obtained for Grant's and Megan's arrest. When Ramos arrived to arrest Grant, Grant was wearing a loose t-shirt. Ramos asked him to raise his arms so Ramos could see if anything was hidden under the shirt. Grant refused. When Ramos grabbed the bottom of the t-shirt, Grant slapped Ramos's arm away and told Ramos to get his "fucking" hands off of him. Grant was then arrested and re-interviewed.

At the second interview, Grant confirmed that he spoke to Hopkins at about one or two o'clock in the morning. Hopkins told him he was coming over to the house and he needed the door opened. Grant said he waited and when Hopkins arrived, Grant opened the back door to the patio. When Grant asked Hopkins what he wanted, Hopkins stated, "You know what I'm here for," and displayed a knife strapped to his waist. Grant said he thought Hopkins was there to kill him. Hopkins told Grant to leave the room and Grant walked into the living room. Grant stated that Hopkins then proceeded to stab Michael. Grant stated that at various times he was held at knifepoint or gunpoint and was forced to help Hopkins. Neither Ramos nor Helms thought Grant was afraid of Hopkins.

During the investigation, Ramos spoke to E.M., a classmate of Grant. When, in E.M.'s view, Grant was acting strange one day, E.M. asked Grant if Grant had killed Michael. Grant nodded his head and made stabbing motions. E.M. was afraid of revealing this information because when he, Grant, and Hopkins, were on their way to buy marijuana on day after the murder, Hopkins told E.M. that if anyone was informing the police about the murder, that person would be in trouble.

Also during the investigation, Investigator Helms took a statement from Megan's father. He stated that during Megan and Michael's divorce, Megan made the statement that she wished Michael was dead or that someone would kill him. Megan's father said that Grant volunteered to do it for his mother.

Helms also took a statement from R.H., a juvenile who was housed in a detention facility in Dennison, Texas. R.H. stated that in August of 2007, prior to R.H.'s detention,

Grant approached him a couple of times and said that he wanted to kill Michael. They then plotted to kill Michael. The plan devised was to stab Michael, load him up in a vehicle, and get rid of the body. R.H. was recruited to help clean up the mess.

Cari Starritt-Burnett, an attorney who assisted Michael with his divorce, testified that when she heard that Michael had been killed, she immediately knew there was foul play and that the family was involved in it. A few months after the divorce, Michael relayed an event to Cari that caused her concern. Michael told her that he woke up one night to see Grant holding a knife over him. John Lee, a local attorney and friend of Michael's, relayed the same incident as told to him by Michael. Lee also said that Grant showed no emotion at Michael's funeral and that he looked bored. When Lee heard of Michael's death, he immediately suspected Grant.

Cheryl Tull, Michael's girlfriend at the time of his death, also testified. She stated that she was around Michael's children on every other weekend and that it was typical for there to be an uncomfortable exchange between Michael and Grant at least once or twice a weekend. By the summer of 2007, Tull had become afraid of Grant. At the end of June, there was an incident where Grant and Michael had yelled at each other. When Grant went to his room, he was heard throwing objects. He also punched holes in his wall. When Grant came out of his room, he said something to the effect, "You're going to die." Tull testified about another episode with Grant during the summer of 2007. They had been to *Schlitterbahn* and stopped to spend the night at Michael's sister's house. There was an "ugly scene" about where the kids were going to sleep. The next day on the way home, Grant leaned up in between the front seats, tapped Michael on

his arm and said something to the effect that there was a place where someone can be stabbed and that the person will die instantly.

*The Determination*

After reviewing the record, we find the juvenile court did not abuse its discretion in finding sufficient facts and circumstances to warrant a prudent person to believe that the suspect committed the offense of murder as a party acting with intent to promote or assist the commission of the offense. Grant's first issue is overruled.

### Seriousness of the Offense

In this third issue, Grant contends that the juvenile court abused its discretion in waiving its jurisdiction based solely on the seriousness of the offense and in failing to consider the actual facts regarding what occurred. Grant argues that there was nothing to suggest the court engaged in an analysis of the facts of the offense. Contrary to Grant's argument, it is clear from the record that the juvenile court took the facts of the offense into consideration and did not base its decision solely on the seriousness of the offense. This consideration is most evident when the trial court made its probable cause determination. After the hearing on the State's petition for discretionary transfer, the trial court stated on the record,

> …there is ample evidence from which to determine that there is probable cause to believe that the defendant committed the offense of murder as a party with two other charged individuals. And without going into any specificity of which evidence that is, but simply that the physical facts of the investigation, the investigation and testimony concerning the two crime scenes, the juvenile respondent's present (sic) at the primary crime scene where the offense would have had to have been committed, the unlikelihood that that could have happened without someone in that residence having been aware of it, and then with everything else, the

phone calls, the statement of the juvenile respondent, all of those matters conspire to establish the probable cause.

Accordingly, the juvenile court did not abuse its discretion in waiving its jurisdiction. Grant's third issue is overruled.

## CRIMINAL COURT PROCEEDINGS

Grant's second and fourth issues on appeal concern his proceedings in criminal court.

### *Motion to Suppress*

His second issue is two fold:  the trial court erred in denying his motion to suppress his written statement[3] because Grant's mother was not notified that he was taken into custody in violation of Texas Family Code Section 52.02(b) and because his mother was denied access to him before he gave his statement.  *See* TEX. FAM. CODE ANN. § 52.02(b) (Vernon 2008).  Grant specifically argued at the motion to suppress hearing that pursuant to section 52.02(b), the law enforcement officers who arrested Grant did not give the required notice to anyone.  He argued that the reason for the notice is so statements are not taken in such a way that juveniles do not have the benefit of advice from someone looking out for them.

Even if a violation of section 52.02(b) has occurred, a holding which we are expressly not making, Grant's statement is not automatically excluded.  To suppress a juvenile's statement because of a violation of section 52.02(b), there must be some exclusionary mechanism.  *Gonzales v. State*, 67 S.W.3d 910, 912 (Tex. Crim. App. 2002).

---

[3] At trial, Grant argued for the suppression of a statement given on September 15, 2007 and a statement given on October 29, 2007.  On appeal, he contests the denial of the motion as to the second statement only.

Section 52.02(b) is not an independent exclusionary statute. *Id.* If evidence is to be excluded because of a section 52.02(b) violation, it must be excluded through the operation of Article 38.23(a). *Id.* In light of Article 38.23(a), before a juvenile's written statement can be excluded due to a violation of section 52.02(b), there must be a causal connection between the Family Code violation and the making of the statement. *Id.* The burden of proving this causal connection rests with the party attempting to exclude the statement, in this case, Grant. *Pham v. State*, 175 S.W.3d 767, 774 (Tex. Crim. App. 2005). Once a causal connection is established, the burden then shifts to the State to either disprove the evidence the defendant has produced, or bring an attenuation-of-taint argument to demonstrate that the causal chain asserted by the defendant was in fact broken. *Id.*

Grant had the burden of proving a causal connection between the alleged violation of section 52.02(b) and his statement. No evidence of a causal connection was presented at the motion for new trial hearing. Accordingly, the trial court was not required to exclude Grant's statement.

To the extent that Grant actually made the argument to the trial court that Grant's mother was denied access to him, that part of the issue is overruled. Generally, section 61.103 of the Texas Family Code provides that parents have a right of access to their child. TEX. FAM. CODE ANN. § 61.103(a) (Vernon 2008). However, if the parent is denied the right of access, the child may not raise that complaint on appeal. *Id.* § 61.106.

Accordingly, the trial court did not err in denying Grant's motion to suppress. Grant's second issue is overruled.

*Constitutionality of Statute*

In his fourth issue, Grant argues that "the Texas Statute prohibiting community supervision for a person convicted of murder" is unconstitutional as applied to him, because it violates the protection against cruel and unusual punishment.  An appellant must preserve an "as applied" constitutional challenge by raising it at trial.  *See Flores v. State*, 245 S.W.3d 432, 437 n.14 (Tex. Crim. App. 2008); *Curry v. State*, 910 S.W.2d 490, 496 (Tex. Crim. App. 1995); *Garcia v. State*, 887 S.W.2d 846, 861 (Tex. Crim. App. 1994).  Grant raised his "as applied" challenge in a pre-trial motion to quash.  However, a motion to quash does not preserve the "as applied" challenge for appeal.  *Flores*, 245 S.W.3d at 437, 442 (Cochran, J., concurring); *Sheldon v. State*, 100 S.W.3d 497, 505 (Tex. App.—Austin 2003, pet. ref'd) (op. on reh'g).  Grant has not preserved this issue for our review.  Accordingly, his fourth issue is overruled.

## CONCLUSION

Having overruled each of Grant's issues on appeal, we affirm the trial court's judgment.


TOM GRAY
Chief Justice

Before Chief Justice Gray,
    Justice Reyna, and
    Justice Davis
Affirmed
Opinion delivered and filed January 27, 2010
Publish
[CRPM]