

# NUMBER 13-22-00239-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE MATTER OF D.D.C., A CHILD.

### On appeal from the 377th District Court
### of Victoria County, Texas.

## MEMORANDUM OPINION

### Before Justices Longoria, Hinojosa, and Silva
### Memorandum Opinion by Justice Longoria

This is an appeal of a juvenile court's grant of the State's petition for discretionary transfer to criminal court. By two issues, which we re-organize and construe as one issue with two sub-issues, appellant D.D.C.[1] argues that the juvenile court abused its discretion in waiving its jurisdiction and transferring D.D.C.'s proceeding to district court for criminal prosecution. Specifically, D.D.C. challenges the sufficiency of the evidence to support the

---

[1] We refer to minor children in an appeal related to juvenile proceedings by their initials in order to protect their identity. *See* TEX. FAM. CODE ANN. §§ 56.01(j).

juvenile court's findings that (1) there was probable cause to believe D.D.C. committed murder and (2) the welfare of the community requires criminal proceedings because of the seriousness of the offense and background of D.D.C. We affirm.

## I.     BACKGROUND

On March 17, 2022, the State filed its amended petition for discretionary transfer to criminal court, alleging that: (1) on February 19, 2022, D.D.C. is alleged to have committed the offense of murder under Texas Penal Code § 19.02 (b)(1) and (b)(3); (2) D.D.C. was fifteen years old at the time he is alleged to have committed the offense; (3) no adjudication hearing had been conducted concerning the alleged offense; and (4) the welfare of the community required the juvenile court to waive jurisdiction and have D.D.C. transferred to criminal court for criminal proceedings because of the seriousness of the offense and the background of the child. On May 19, 2022, the juvenile court had a hearing on the State's amended petition for discretionary transfer. The juvenile court took judicial notice of the contents of the court's file, which included a psychological evaluation report by Karan Redus, Ph.D. The State and D.D.C. presented some witnesses' testimony, which we summarize below.

Richard Theis, Ph.D., a psychologist, testified that he had interviewed D.D.C. Although he did not administer psychological tests to D.D.C., he reviewed some tests that had been conducted by Dr. Redus. Dr. Theis opined that the results of the Minnesota Multiphasic Personality Inventory-Adolescents (MMPI-A) exam administered to D.D.C. were invalid and should be set aside because D.D.C. had reported that staff at the detention center and Dr. Redus reinterpreted fifty questions for him, which was

2

inconsistent with testing protocol. Dr. Theis testified that D.D.C.'s school records indicated his grades were A's and B's, but Dr. Theis expressed surprise that D.D.C. was not in special education. Dr. Theis testified that D.D.C.'s overall intellectual profile was estimated to be in the low to average range, significantly below that of most children his age. Dr. Theis also testified that D.D.C.'s reading and comprehension levels were significantly below a seventh-grade level, which equated to an average twelve-year-old. Dr. Theis concluded that D.D.C.'s limited intellectual abilities, impoverished background, and other factors resulted in D.D.C.'s maturity level being much less than his chronological age. Dr. Theis also concluded that D.D.C. could be rehabilitated with significant psychological or psychiatric intervention and educational opportunities consistent with his intellectual limitations.

Shane Wesley Collins, former detective of the Victoria Police Department, testified that on February 19, 2022, his supervisor notified him that multiple 911 callers reported a shooting that occurred at Lova Drive in Victoria County, Texas. Officers at the scene found Tinasha Upton unconscious on the ground, bleeding from a gunshot wound on the back of her head, next to a vehicle that had been driven into a fence. Upton died as a result of her injuries. Upton's children and their friend were found at the scene and interviewed. Based on their statements, Collins determined that D.W.,[2] one of Upton's juvenile sons, had an altercation with J.T.B., another male juvenile, at a carnival prior to the shooting. During that altercation, J.T.B. and an unidentified Hispanic male confronted D.W. and one

---

[2] We refer to a minor by their initials or an alias in order to protect their identity. *See* TEX. R. APP. P. 9.8(c)(2).

of his brothers. According to the statements, J.T.B. had a gun in his waistband and tried to lure D.W. and his brother into a darkened area, but D.W. and his brother left.

Collins further testified that J.T.B. was interviewed at the juvenile detention center and provided two statements. In his second statement, J.T.B. admitted that both he and D.D.C. were involved in the shooting. J.T.B. stated that because of the altercation at the carnival, they followed Upton's vehicle. When Upton made a U-turn on Lova Drive, heading towards them, "[J.T.B.] and [D.D.C.] reached out the window with firearms and shot at [Upton's] vehicle." J.T.B. also stated that Jacqueline Perez, D.D.C.'s girlfriend, drove the vehicle from which shots were fired at Upton's vehicle.

Collins testified that Perez provided a statement and explained she went to the carnival to pick up D.D.C. and J.T.B. The three went to a house to pick up other juveniles, "went back to the carnival, [and] waited for the victims to leave with their mother." Perez confirmed that they followed Upton's vehicle onto Lova Drive, and that after Upton made a U-turn, "multiple shots were fired as the vehicles were passing." Perez did not identify who shot the firearms but admitted to dropping off J.T.B. and the other juveniles after the shooting, and that she and D.D.C. went back to their apartment. Another juvenile, M.R., also provided a statement and identified D.D.C.[3] Based on the statements of J.T.B., Perez, and M.R., Collins concluded he had probable cause to believe that D.D.C. was an active participant in the shooting and death of Upton. On cross-examination, Collins confirmed that J.T.B., M.R., and Perez all had lied at some point during their interviews and had changed their statements.

---

[3] The record is not clear as to the content of M.R.'s statements.

Dr. Redus testified that she performed a psychological evaluation of D.D.C. Dr. Redus first administered a test which assesses "reasoning ability, ability to use words and vocabulary." D.D.C. received an IQ score in the "below average range", at about the "[sixteenth] percentile." Dr. Redus testified that "[D.D.C.'s] ability to recognize words appeared to be average" and that "his school records reflected that he was in regular education," which was consistent with his performance on the test. Dr. Redus also administered the Risk-Sophistication-Treatment Inventory (RSTI), "a semi-structured interview with questions designed to identify a child's level of maturity, emotionally and thinking wise and experience wise." As far as risk of dangerousness, D.D.C. was in the high offender range, meaning he had an "elevated risk of dangerousness compared to other juvenile offenders his age." Regarding emotional maturity and sophistication, "[D.D.C.'s] ability to function autonomously and make decisions for himself" was average. D.D.C. scored in the mid-range of juvenile offenders on "other questions that looked at the ability to control impulses, deal with feelings, ability to reason and evaluate decisions, evaluate the pros and cons of decisions before making the decision, before acting." In addition, D.D.C. scored in the mid-range for treatment amenability. Dr. Redus further testified that "[D.D.C.] indicated an openness and willingness to receive help and verbalize that he thought there would be benefits to him if he were to receive help." Based on D.D.C.'s statements, Dr. Redus concluded that D.D.C. was serious and sincere about wanting help because during the evaluation, D.D.C. had talked about being so angry most of his life, had trouble managing his anger, and wanted to provide a different life for his family in the future.

Dr. Redus acknowledged the criticisms by Dr. Theis regarding the administration of the MMPI-A. Dr. Redus explained that the results of the MMPI-A did not constitute the main manner in which she formed her conclusions regarding D.D.C.; her evaluation was primarily based on the interview, his presentation, their interactions, and other factors. The MMPI-A results demonstrated that D.D.C. was an "angry adolescent who had problems with impulse control and who also was experiencing some depression"—a result which correlated with what Dr. Redus had been observing from D.D.C. in his self-report. Dr. Redus affirmed that even if someone had explained the MMPI-A questions to D.D.C., he appeared to answer them in a way that was consistent with what she had already observed. Dr. Redus concluded that "[D.D.C.] appeared to be . . . an adolescent who tries to present a surface, outward image of being okay and being street smart, . . . but inwardly is probably depressed, probably has feelings of inadequacy and lack of self-confidence, . . . and has some unresolved issues with some traumatic events in his life." Dr. Redus opined that "[D.D.C.'s] ability to make decisions and control impulses were only at a level that would be typical of juvenile offenders who have these problems and in comparison to an adult would probably be considered immature." Dr. Redus affirmed these findings were consistent with her assessment that D.D.C. is a high-risk offender because of his problems with impulse control and his history of fighting. Dr. Redus affirmed that, based on her training and experience, immaturity can correlate with dangerousness. Dr. Redus assessed that D.D.C. did not have an intellectual disability but was behind most children his age. In addition, in her psychological evaluation report, Dr. Redus indicated that D.D.C. "presented as being someone who understood the difference

6

between right and wrong and that there are consequences for his behavior."

Dr. Redus concluded that D.D.C. appeared to be treatable with a structured long-term treatment program that would include daily therapy and "24/7" supervision. Dr. Redus further testified that D.D.C. could be rehabilitated through proper treatment, and treatment would be more beneficial if designed for his age group and intellectual ability. Dr. Redus diagnosed D.D.C. with "disruptive impulse control conduct disorder, the unspecified depressive disorder, and unspecified trauma and stressor[-]related disorder." Dr. Redus affirmed that any one of these disorders could impair a person's thoughts, perception of reality, and emotional process or judgment. Dr. Redus affirmed that all children have "developmental and psychological differences" in comparison to adults, and that it is hard to recommend that any child be treated as an "adult psychologically".

Senea Williams, a juvenile probation officer for Victoria County, testified that D.D.C. was born in 2006, and was sixteen years old. D.D.C. had four previous referrals to the probation department for the following offenses: evading arrest or detention on December 22, 2021; possession of marijuana on December 8, 2021; unauthorized use of a vehicle on April 7, 2021; and assault causing bodily injury to a family member on April 23, 2020. D.D.C. was adjudicated for the assault on May 6, 2021. While on probation for the assault offense, D.D.C. violated multiple conditions of his probation, including failing to attend community service, being disrespectful to probation officers, testing positive for marijuana, posting images with a gun on Instagram, evading arrest or detention, and associating with another probationer. Williams testified that D.D.C.'s social media presence indicated his affiliation with the Closed Mouth Playas (CMP), a gang associated

with the Blood Stone Villains (BSV) gang. Williams testified that a majority of D.D.C.'s social media posts had firearms; that D.D.C.'s username was "CMP [D.D.C.]"; and that D.D.C. associated with other individuals on social media whose posts and photos suggested they were gang-affiliated. Two of the co-defendants in this case, J.T.B. and Z.F., had also been on probation. Z.F., in particular, had images on social media indicating he is a member of BSV, and expressly states so on his Instagram. Williams also testified that there were photos of D.D.C., Z.F., and another co-defendant that were posted on social media. Williams further testified that there were over fifty incident reports involving D.D.C. since his time in custody. D.D.C. had multiple minor incidents while in detention and major incidents as well, including fights with other individuals in detention. Williams believed, based on communication with D.D.C, that D.D.C. understands the seriousness of the nature of the offense alleged against him, its consequences, and the transfer hearing process.

Williams opined that Victoria County did not have the "resources to accommodate a child convicted at the juvenile level for murder," specifically in relation to "the intensity of a program and the amount of structure that [D.D.C.] would require." Williams further opined that the Texas Juvenile Justice Department (TJJD) would also not be able to provide these services to D.D.C. and that it would not be a sufficient place for him. Williams concluded that the juvenile system would not likely be able to rehabilitate D.D.C. Williams recommended that D.D.C. be transferred to criminal court based on D.D.C.'s history, the number of detentions during his time on probation, D.D.C.'s history of aggression, and the seriousness and nature of the murder offense alleged against him.

Williams also concluded that the juvenile system would not provide adequate protection of the public.

At the conclusion of the May 19, 2022 hearing, the juvenile court granted the State's amended petition for discretionary transfer and signed an order waiving jurisdiction. The juvenile court's order consisted of the following relevant findings:

> The Court finds that the offense alleged in the State's [Amended] Petition For Discretionary Transfer to Adult Criminal Court is of grade of felony of the 1[st] degree.
>
> The Court finds that no adjudication hearing has been conducted concerning the offense alleged in the State's [Amended] Petition for Discretionary Transfer to Adult Criminal Court.
>
> The Court finds that the Juvenile-Respondent was born on . . . 2006, and was 15 years of age on the date of the alleged offense.
>
> All parties having announced ready, this Court conducted a full investigation as required by Section 54.02(a)(3), Texas Juvenile Justice Code. Among others, this Court considered the following matters: (1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person; (2) the sophistication and maturity of the Child; (3) the record and previous history of the Child; and (4) the prospects of adequate protection of the public and the likelihood of rehabilitation of the [C]hild by use of procedures, services and facilities currently available to the juvenile court.
>
> After conducting such full investigation, including evidence and argument of counsel, the Court finds that the welfare of the community requires criminal proceedings, because of the seriousness of the offense and background of the Child and that there is probable cause to believe that the Child committed the offense of Murder (Sec. 19.02 of the Penal Code of Texas) as alleged in the State's [Amended] Petition for Discretionary Transfer to Adult Criminal Court, and that this Court waive its exclusive, original jurisdiction of this cause as to the Child and felony offense alleged in the State's [Amended] Petition For Discretionary Transfer To Adult Criminal Court, said felony offense reading as follows: That on or about the 19[th] day of February, A.D. 2022, in the County of Victoria and State of Texas, said Child violated a penal law of this State punishable by imprisonment, to-wit: Section 19.02, of the Penal Code of the State of

9

Texas, in that the [Child] did then and there, intentionally and knowingly cause the death of an individual, namely Tinasha Lashaun Upton, by shooting Tinasha Lashaun Upton in the head with a firearm.

In addition, [t]hat on or about the 19th day of February, A.D. 2022, in the County of Victoria and State of Texas, said Child violated a penal law of this State punishable by imprisonment, to-wit: Section 19.02, of the Penal Code of the State of Texas, in that the [Child] did then and there, commit or attempt to commit [an] act clearly dangerous to human life, namely shooting a firearm at or in the direction of a moving vehicle with a driver and passengers inside said vehicle, that caused the death of Tinasha Lashaun Upton, hereafter [styled] the complainant, and the [Child] was then and there in the course of intentionally and knowingly committing a felony, namely deadly conduct by [d]ischarge of a [f]irearm, and the death of the complainant was caused while the [Child] was in the course of and in furtherance of the commission or attempt of the felony.

This Court is hereby waiving its exclusive, original jurisdiction for the following reasons: the offense was against a person; the Child knows right from wrong and that his actions were not the result of his failure to understand the rules of society and the consequences of violating those rules; [and] the prospect of adequate protection of the public and likelihood of rehabilitation of Child by the use of procedures, services[,] and facilities currently available through juvenile court is unlikely.

The juvenile court further ordered that D.D.C. "be committed immediately to the custody of the Sheriff of Victoria County, Texas[,] and dealt with as an adult."

This accelerated appeal followed. *See* TEX. FAM. CODE ANN. § 56.01(c)(1)(A) ("An appeal may be taken . . . by or on behalf of a child from an order entered under . . . [§] 54.02 respecting transfer of the child for prosecution as an adult . . . ."); *id.* § 56.01(h) ("If the order appealed from takes custody of the child from the child's parent, guardian, or custodian or waives jurisdiction under [§] 54.02 and transfers the child to criminal court for prosecution, the appeal has precedence over all other cases.").

10

## II. DISCUSSION

### A. Standard of Review

"We review a juvenile court['s] decision to waive its exclusive original jurisdiction and transfer a case to criminal district court using two steps." *Bell v. State*, 649 S.W.3d 867, 887 (Tex. App.—Houston [1st. Dist.] 2022, no pet. h.). "First, we review the juvenile court's findings using the traditional evidentiary sufficiency review." *Id.* "In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the juvenile court's findings and disregard contrary evidence unless a reasonable fact finder could not reject it." *Id.*; *see also Faisst v. State*, 105 S.W3d 8, 12 (Tex. App.—Tyler 2003, no pet.). "If there is more than a scintilla of evidence to support the findings, then the evidence is legally sufficient." *Bell*, 649 S.W.3d at 887; *see also Faisst*, 105 S.W3d at 12.

"If the findings of the juvenile court are supported by legally and factually sufficient proof, then we review the ultimate waiver decision under an abuse-of-discretion standard." *Bell*, 649 S.W.3d at 887. "A court abuses its discretion if it acts without reference to any guiding rules and principles." *Id.* (citing *In re Nat'l Lloyds Ins.*, 507 S.W.3d 219, 226 (Tex. 2016) (orig. proceeding) (per curiam)). "A juvenile court abuses its discretion when its transfer decision is essentially arbitrary, given the evidence upon which it was based." *Id.* "By contrast, a waiver decision representing a reasonably principled application of the legislative criteria generally will pass muster under the abuse-of-discretion standard of review." *Id.* (internal quotations omitted). "An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence." *In re B.N.F.*, 120 S.W.3d 873, 877 (Tex. App.—Fort Worth 2003, no pet.). But "[a] trial court

11

has no 'discretion' in determining what the law is or applying the law to the facts." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding). "Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion." *Id*.

The juvenile court is the sole factfinder in a transfer hearing and may choose to believe or disbelieve any or all of the witnesses' testimony. *See Grant v. State*, 313 S.W.3d 443, 444–445 (Tex. App.—Waco, 2010 no pet.) (citing *In re D.W.L.*, 828 S.W.2d 520, 524 (Tex. App.—Houston [14th Dist.] 1992, no writ)).

## B.    Applicable Law

When a child engages in conduct that would be considered criminal if committed by an adult, it is called "delinquent conduct." *See* TEX. FAM. CODE ANN. § 51.03(a)(1). Delinquency proceedings against minors proceed in juvenile court under the Juvenile Justice Code, codified in Title 3 of the Texas Family Code. *See id.* §§ 51.01–61.107. Juvenile courts have exclusive original jurisdiction over cases involving delinquent conduct by children between ten years of age or older and under seventeen years old. *Id.* §§ 51.02(2)(a), (2)(b), 51.04(a).

A juvenile court may waive its exclusive original jurisdiction and transfer the juvenile proceeding to a district court for criminal prosecution under certain conditions. *See id.* § 54.02(a), (j). "The transfer of a juvenile offender from juvenile court to criminal court for prosecution as an adult should be regarded as the exception, not the rule; the operative principal is that, whenever feasible, children and adolescents below a certain age should be 'protected and rehabilitated rather than subjected to the harshness of the

criminal system.'" *Ex parte Thomas*, 623 S.W.3d 370, 376 (Tex. Crim. App. 2021) (quoting *Hidalgo v. State*, 983 S.W.2d 746, 754 (Tex. Crim. App. 1999)). "The burden is upon the State to prove transfer is appropriate." *Id.* "What the State must prove to obtain transfer depends on whether the minor has reached the age of eighteen by the date of the transfer hearing." *In re A.M.*, 577 S.W.3d 653, 658 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). Section 54.02(a) applies where the juvenile is under eighteen years of age at the time of the transfer hearing, while § 54.02(j) applies where the juvenile is eighteen years of age or older at the time of the hearing. *Id.*; TEX. FAM. CODE ANN. § 54.02(a), (j). Section 54.02(j) is not implicated in this appeal.

Under § 54.02(a), the juvenile court may waive its exclusive original jurisdiction and transfer a child to the appropriate district court or criminal district court for criminal proceedings if:

> (1) the child is alleged to have violated a penal law of the grade of felony;
>
> (2) the child was fourteen years of age or older at the time he is alleged to have committed the offense, if the offense is a capital felony, an aggravated controlled substance felony, or a felony of the first degree, and no adjudication hearing has been conducted concerning that offense; and
>
> (3) after a full investigation and a hearing, the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense alleged or the background of the child the welfare of the community requires criminal proceedings.

TEX. FAM. CODE ANN. § 54.02(a). In making this determination, the juvenile court shall consider, among other matters:

> (1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

13

(2) the sophistication and maturity of the child;

(3) the record and previous history of the child; and

(4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

*Id.* § 54.02(f).

"These [§] 54.02(f) factors are non-exclusive factors that facilitate the juvenile court's balancing of potential danger to the public posed by the juvenile offender with his 'amenability to treatment.'" *Bell*, 649 S.W.3d at 886 (quoting *In re C.O.*, No. 02-21-00235-CV, 2021 WL 5933796, at *5 (Tex. App.—Fort Worth Dec. 16, 2021, pet. denied) (mem. op.)); *see also In re M.A.T.*, No. 13-18-00295-CV, 2018 WL 5289550, at *2 (Tex. App.—Corpus Christi–Edinburg, Oct. 25, 2018, no pet.) (mem. op.). "Any combination of these factors may suffice to support a waiver of the juvenile court's exclusive original jurisdiction and not every factor need weigh in favor of transfer to the criminal district court." *Bell*, 649 S.W.3d at 886; *Hidalgo*, 983 S.W.2d at 754 n.16 ("The juvenile court is not required to find each criterion before it can transfer a case to district court. The court may order a transfer on the strength of any combination of the criteria."). "The trial court is bound only to consider these . . . factors in deciding whether to waive jurisdiction. The court need not find that each factor is established by the evidence." *In re C.M.M.*, 503 S.W.3d 692, 701 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (quoting *In re D.L.N.*, 930 S.W.2d 253, 258 (Tex. App.—Houston [14th Dist.] 1996, no writ)).

"Although the juvenile court, when waiving its exclusive original jurisdiction, must state in its order the reasons or considerations for waiving its jurisdiction, the juvenile

14

court need not set forth detailed, case-specific findings as to the Texas Family Code section 54.02(f) factors." *Bell*, 649 S.W.3d at 887 (quoting *Ex parte Thomas*, 623 S.W.3d at 381–83).

**C.    Analysis**

D.D.C. claims that the juvenile court abused its discretion when it waived its jurisdiction and transferred his proceeding to district court for criminal prosecution. In connection to this claim, D.D.C. does not challenge the juvenile court's findings that D.D.C. is alleged to have violated a penal law of the grade of first-degree felony, that D.D.C. was fifteen years old at the time he is alleged to have committed the offense, or that no adjudication hearing had been conducted concerning that offense. *See* TEX. FAM. CODE ANN. § 54.02(a)(1), (2). Instead, D.D.C. argues there was insufficient evidence to support the juvenile court's findings that (1) there was probable cause to believe D.D.C. committed murder, and (2) the welfare of the community requires criminal proceedings because of the seriousness of the offense and background of D.D.C. *See id.* § 54.02(a)(3). We address each sub-issue in turn.

**1.    Probable Cause to Believe D.D.C. Committed Murder**

In its order waiving jurisdiction, the juvenile court found probable cause to believe that D.D.C. committed the murder of Upton under § 19.02(b)(1) and (b)(3) of the Texas Penal Code. "Probable cause consists of sufficient facts and circumstances to warrant a prudent person to believe that the suspect committed the offense." *Grant*, 313 S.W.3d at 445 (citing *In re K.B.H.*, 913 S.W.2d 684, 689 (Tex. App.—Texarkana 1995, no pet.) and *In re D.W.L.*, 828 S.W.2d at 524). A person commits murder if he intentionally or

knowingly (1) causes the death of an individual, or (2) commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commissions or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02 (b)(1), (b)(3).

The record provides evidentiary support for the juvenile court's findings. The State presented evidence about the investigation of the murder. Collins testified that on February 19, 2022, multiple 911 callers reported a shooting at Lova Drive in Victoria County, Texas. Collins further testified that officers at the crime scene found Upton unconscious on the ground, bleeding from a gunshot wound on the back of her head, and that Upton died as a result of her injuries. Statements made by Upton's children and their friend, who were present at the scene, indicated that there had been an altercation at a carnival between D.W., Upton's juvenile son, J.T.B., and an unidentified Hispanic male. Those statements also indicated that J.T.B. was armed with a gun. Statements made by J.T.B. showed that after the altercation at the carnival, J.T.B., D.D.C., and Perez followed Upton's vehicle. J.T.B.'s statements also indicated that they followed Upton's vehicle in Perez's vehicle and that Perez was the driver. J.T.B. further admitted that when Upton's vehicle made a U-turn on Lova Drive, heading towards Perez's vehicle, J.T.B. and D.D.C. reached out of Perez's vehicle with firearms and shot Upton's vehicle. Perez's statement confirmed J.T.B.'s account of the shooting, although she did not identify who shot the firearms.

D.D.C. argues that there is a lack of evidence of his involvement in the shooting

16

beyond uncorroborated accomplice testimony. Article 38.14 of the Texas Code of Criminal Procedure, commonly referred to as the accomplice witness rule, provides that "[a] *conviction* cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14. (emphasis added). By its plain terms, article 38.14 does not apply to probable cause determinations. *See id*. Furthermore, D.D.C. cites no case authority, and we can find none, that require corroboration of accomplice witness statements in probable cause determinations. *See In re C.R.*, 571 S.W.3d 849, 859 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (holding that "[T]he objective of a certification hearing is not to determine ultimate guilt or innocence, but rather to determine if there is probable cause to believe the child committed the offense alleged . . . Appellant has presented no authority that the juvenile court is prohibited from considering evidence obtained from an accomplice in the context of a transfer decision."); *In re D.J.*, 909 S.W.2d 621, 622–23 (Tex. App.—Fort Worth 1995, writ dism'd w.o.j.) (concluding confessions of child's accomplices, which implicated child in robberies, were admissible at transfer hearing because "[i]n a transfer hearing, the rules of evidence are relaxed"); *In re J.D.H.*, Nos. 01-17-00889-CV, 01-17-00890-CV, 2018 WL 2107244, at *9–10 (Tex. App.— Houston [1st Dist.] May 8, 2018, no pet.) (mem. op.) (holding juvenile court not prohibited from considering evidence obtained from alleged accomplice or co-actor).

D.D.C. also argues that the three witnesses relied on by Collins to establish probable cause changed their stories after repeated interviews by police. As the sole

17

factfinder, the juvenile court was entitled to believe or disbelieve any or all of the witnesses' testimony. *See Grant*, 313 S.W.3d at 444–45. Here, the juvenile court was entitled to credit Collin's testimony regarding the investigation of the murder of Upton, including his testimony regarding the statements of J.T.B., Perez, and M.R.

Based on the record, there is more than a scintilla of proof supporting the existence of probable cause to believe that D.D.C. committed the alleged murder offense, and the great weight and preponderance of the evidence is not to the contrary. *See Bell*, 649 S.W.3d at 887. Accordingly, we conclude there is both legally and factually sufficient evidence to support the juvenile court's findings that there was probable cause to believe that D.D.C. committed the alleged murder offense. [4] *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (b)(3); *see also Bell*, 649 S.W.3d at 887. We overrule D.D.C.'s first sub-issue.

## 2. Welfare of the Community Requires Criminal Proceedings

In its order waiving jurisdiction, the juvenile court stated it considered all four factors from § 54.02(f) of the Texas Family Code. TEX. FAM. CODE ANN. § 54.02(f). In addition, the juvenile court stated the following reasons for its waiver: (1) "the offense was against a person"; (2) "[D.D.C.] knows right from wrong and that his actions were not the result of his failure to understand the rules of society and the consequences of violating those rules"; and (3) "the prospect of adequate protection of the public and likelihood of

---

[4] Furthermore, the evidence was legally and factually sufficient to implicate D.D.C. as a primary actor or party. "Texas law allows individuals to be charged as a party to an offense and to be held criminally responsible for the conduct of another when that individual acts in concert with another person in committing an offense." *Powell v. State*, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006) (citing TEX. PENAL CODE ANN. §§ 7.01, 7.02). "It is well-settled that the law of parties need not be [pleaded] in the indictment." *Marable v. State*, 85 S.W.3d 287, 287 (Tex. Crim. App. 2002).

rehabilitation of [D.D.C.] by the use of procedures, services and facilities currently available through juvenile court is unlikely." D.D.C. argues that the evidence is insufficient to support the juvenile court's findings as to the § 54.02(f) factors because, although the alleged murder offense constituted an offense against a person, the other factors did not support transfer, and therefore, the juvenile court's order waiving its jurisdiction constituted an abuse of discretion. *See id*. We disagree.

### a. Alleged Offense

As for the first § 54.02(f) factor, the juvenile court found that the alleged offense was against a person. As previously discussed, we concluded there is both legally and factually sufficient evidence to support the juvenile court's findings that there was probable cause to believe that D.D.C. committed murder under § 19.02(b)(1) and (b)(3) of the Texas Penal Code. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (b)(3). Because D.D.C.'s alleged offense against a person involved a shooting that led to a person's death, the alleged offense weighs heavily in favor of transfer. *See* TEX. FAM. CODE ANN. § 54.02(f)(1); TEX. PENAL CODE ANN. §§ 12.04(a) ("Classification of Felonies"), 19.02(c) (murder constitutes a first-degree felony except as provided by subsection (d)).

### b. Sophistication and Maturity

As for the second § 54.02(f) factor, the juvenile court found that "[D.D.C.] knows right from wrong and that his actions were not the result of his failure to understand the rules of society and the consequences of violating those rules." "Evidence that the juvenile understands the seriousness of the charge against him as well as the proceedings support a juvenile court's finding that the child's sophistication and maturity weigh in favor

19

of transfer." *Bell*, 649 S.W.3d at 893; *see Gonzales v. State*, 467 S.W.3d 595, 600–01 (Tex. App.—San Antonio 2015, pet. ref'd) (citing child's understanding of proceedings and alleged offense as evidence of sophistication and maturity); *see also In re K.J.*, 493 S.W.3d 140, 151 (Tex. App.—Houston [1st Dist.] 2016, no pet.) ("In assessing maturity and sophistication, courts place weight on whether there is evidence indicating that the juvenile does not know right from wrong.").

Dr. Redus concluded that "[D.D.C.] appeared to be . . . an adolescent who tries to present a surface, outward image of being okay and being street smart, . . . but inwardly is probably depressed, probably has feelings of inadequacy and lack of self-confidence, . . . and has some unresolved issues with some traumatic events in his life." She explained that D.D.C.'s ability to make decisions and control impulses were only at a level that would be typical of juvenile offenders who have these problems and in comparison to an adult would probably be considered immature. Dr. Redus affirmed that these findings were consistent with her assessment that D.D.C. is a high-risk offender; she explained that D.D.C. had an elevated risk of dangerousness compared to other juvenile offenders his age because of his problems with impulse control and his history of fighting. Dr. Theis's independent review of Dr. Redus's psychological evaluation echoed substantially the same conclusions: D.D.C.'s limited intellectual abilities, impoverished background, and other factors resulted in D.D.C.'s maturity level not matching his chronological age.

Although Dr. Redus's psychological evaluation revealed that D.D.C. had a below-average IQ, "a 'borderline IQ' and educational abilities that are 'below grade level' are not

determinative of a child's sophistication and maturity, and 'how to weigh the evidence [is] a matter of the juvenile court's discretion.'" *See Bell*, 649 S.W.3d at 893 (cleaned up); *see also In re K.D.S.*, 808 S.W.2d 299, 302–03 (Tex. App.—Houston [1st Dist.] 1991, no writ.) (explaining "I.Q. is only one element to be used to determine whether a [child] is of sufficient sophistication and maturity to be tried as an adult" and holding evidence sufficient to support juvenile court's finding that child's sophistication and maturity weighed in favor of transfer because even though child had "maturity of a nine to 11-year[-]old child," evidence showed child "was capable of understanding the proceedings against her," could assist her attorneys in her defense, and "was intellectually capable of distinguishing right from wrong").

Despite their conclusions that D.D.C. was immature, other testimony from Dr. Redus and Dr. Theis indicated that D.D.C. was intellectually capable of distinguishing right from wrong, weighing in favor of transfer. *See In re K.J.*, 493 S.W.3d at 151; *Bell*, 649 S.W.3d at 893; *Gonzales*, 467 S.W.3d at 600–01. Dr. Redus testified that D.D.C.'s ability to recognize words appeared to be average, and the fact that D.D.C. was in regular education was consistent with this result. Dr. Theis testified that D.D.C.'s school records indicated his grades were A's and B's, and Dr. Theis expressed surprise that D.D.C. was not in special education. Dr. Redus also testified that D.D.C. did not have an intellectual disability but was behind most children his age. Dr. Redus further testified that D.D.C. had average development as far as his ability to function autonomously and make decisions for himself. D.D.C. scored in the mid-range of juvenile offenders on other questions that looked at the ability to control impulses, deal with feelings, and ability to

21

reason and evaluate the pros and cons of decisions before acting upon them. Dr. Redus's psychological evaluation report indicated that D.D.C. "presented as being someone who understood the difference between right and wrong and that there are consequences for his behavior." In addition, Williams testified that D.D.C. understands the seriousness of the nature of the offense alleged against him, its consequences, and the transfer hearing process.

Moreover, evidence that a child attempted to conceal his participation in an offense, for instance by fleeing, demonstrates both the child's sophistication and maturity as well as culpability. *See In re G.B.*, 524 S.W.3d 906, 920 (Tex. App.—Fort Worth 2017, no pet.) (concluding decisions child made after committing offense to avoid punishment, such as "getting rid of [the complainant's] phone to avoid being tracked," were decisions "more sophisticated and mature than the decisions made by most fourteen-year-old children" and supported juvenile court's finding that the child "was sufficiently sophisticated and mature to stand trial as an adult"); *see also In re T.C.*, No. 06-21-00075-CV, 2022 WL 398419, at *4 (Tex. App.—Texarkana 2022, no pet.) (mem. op.) (noting evidence showed child "absconded after committing the alleged offenses" and "[f]rom th[at] fact, the juvenile court could have concluded that [the child] was aware that his actions were wrong" when assessing child's sophistication and maturity.). In this case, Collins testified that Perez admitted to dropping off J.T.B. and other juveniles after the shooting, and that she and D.D.C. went to their apartment. Perez's statement indicates that D.D.C. fled the scene immediately after the shooting, demonstrating D.D.C.'s attempt to conceal his participation in the offense. *See In re G.B.*, 524 S.W.3d at 920; *In re T.C.*,

22

2022 WL 398419, at *4.

We acknowledge that there is evidence both for and against a finding of maturity and sophistication. We do not agree, however, that the evidence of immaturity that D.D.C. points to renders the juvenile court's finding erroneous as legally or factually insufficient. Having reviewed the record, we conclude that there is more than a scintilla of proof supporting that juvenile court's finding that "[D.D.C.] knows right from wrong and that his actions were not the result of his failure to understand the rules of society and the consequences of violating those rules," and the great weight and preponderance of the evidence is not to the contrary. *See Bell*, 649 S.W.3d at 893. Therefore, there was legally and factually sufficient evidence to support the juvenile court's finding. *See* TEX. FAM. CODE ANN. § 54.02(f)(2); *see also Bell*, 649 S.W.3d at 887.

### c.    Record and Previous History

As for the third § 54.02(f) factor, the juvenile court did not make explicit findings regarding the record and previous history of D.D.C.

Although a record with the juvenile department is not necessary to support a transfer, the existence of a record supports a finding in favor of transfer. *See Bell*, 649 S.W.3d at 895 ("A child need not have a prior record with the juvenile department for his record and previous history to weigh in favor of transfer"); *see also In re S.G.R.*, 496 S.W.3d 235, 241–42 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (sufficient evidence supported juvenile court's finding child's record and previous history weighed in favor of transfer even though child's record did "not reflect prior delinquency or criminal proceedings"). Here, the testimony and evidence demonstrate D.D.C.'s criminal history,

weighing in favor of transfer.

Williams testified that D.D.C. had four previous referrals to the probation department prior to his referral for murder. D.D.C. had a referral for unauthorized use of a vehicle from April 7, 2021, for evading arrest or detention from December 22, 2021, and possession of marijuana from December 8, 2021, all of which were unadjudicated. D.D.C. also had a referral for an assault causing bodily injury to a family member from April 23, 2020, which was adjudicated on May 6, 2021. While on probation for the assault offense, D.D.C. violated various conditions of probation including failing to attend community service, being disrespectful to probation officers, testing positive for marijuana, posting images with a gun on Instagram, evading arrest or detention, and associating with another probationer.

D.D.C. argues the record is insufficient to support certification on this factor because his unadjudicated offenses are nonviolent, and that his adjudicated offense is only a misdemeanor under § 22.01 of the penal code. *See* TEX. PENAL CODE ANN. § 22.01. However, there was other evidence in addition to D.D.C.'s previous criminal activities. "A juvenile court may give significant weight to a child's gang affiliation when assessing the child's previous history, even when the evidence on the subject is disputed." *Bell*, 649 S.W.3d at 895; *see also In re S.G.R.*, 496 S.W.3d at 241–42 ("A juvenile court does not err by according significant weight to evidence of affiliation with a criminal street gang in connection with a child's record and previous history, as these gangs are by definition regularly engaged in criminal activities."). Williams's testimony indicated that D.D.C. was a member of CMP. Notably, Williams testified that a majority of D.D.C.'s social media

24

posts had firearms, that his social media username was "CMP [D.D.C.]," and that D.D.C. associated with other individuals on social media whose posts and photos suggested they were gang-affiliated. There is no contradictory evidence regarding D.D.C.'s gang affiliation.

In addition, "the juvenile court may consider . . . rule infractions while the child is in the juvenile detention facility following the commission of the offense in determining whether the child's record and previous history weigh in favor of transfer." *Bell*, 649 S.W.3d at 895; *see also In re K.J.*, 493 S.W.3d at 152–53. Williams testified that there were over fifty incident reports involving D.D.C. since his time in custody. Though a majority of his infractions were described by Williams as minor, D.D.C. was involved in major incidents as well, including fights with other individuals in detention.

There is more than a scintilla of proof supporting an implied finding favoring transfer regarding public safety and rehabilitation, and the great weight and preponderance of the evidence is not to the contrary. *See Bell*, 649 S.W.3d at 893. The evidence is therefore legally and factually sufficient evidence to support a finding that § 54.02(f)(3) weighed in favor of the juvenile court's waiver of its jurisdiction. *See* TEX. FAM. CODE ANN. § 54.02(f)(3); *see also Bell*, 649 S.W.3d at 893.

### d.     Protection of the Public and Likelihood of Rehabilitation

As for the fourth § 54.02(f) factor, the juvenile court found that "the prospect of adequate protection of the public and likelihood of rehabilitation of [D.D.C.] by the use of procedures, services and facilities currently available through juvenile court is unlikely."

"A court does not abuse its discretion by finding the community's welfare requires

transfer due to the seriousness of the crime alone, regardless of the child's background." *McKaine v. State*, 170 S.W.3d 285, 291 (Tex. App.—Corpus Christi–Edinburg 2005, no pet.); *see Faisst v. State*, 105 S.W.3d 8, 11 (Tex. App.—Tyler 2003, no pet.) ("[A] court does not abuse its discretion by finding the community's welfare requires transfer due to the seriousness of the crime [intoxication manslaughter] alone, despite the child's background."); *see also In re M.G.*, No. 13-18-00294-CV, 2018 WL 6241036, at *3 (Tex. App.—Corpus Christi–Edinburg Nov. 29, 2018, no pet.) (mem. op.). Collins's testimony demonstrated that D.D.C. participated in a pre-meditated plan to follow and shoot firearms at the occupants of Upton's vehicle, which resulted in Upton's murder. Accordingly, the seriousness of the crime alone supports the juvenile court's finding under § 54.02(f)(4). *See* TEX. FAM. CODE ANN. § 54.02(f)(3); *McKaine*, 170 S.W.3d at 291; *Faisst*, 105 S.W.3d at 11.

Further evidence of D.D.C.'s background indicated that he posed great risk to the safety of the public. Dr. Redus assessed that D.D.C. was in the high offender range for risk of dangerousness—meaning he had an elevated risk of dangerousness compared to other juvenile offenders his age—because of his problems with impulse control and his history of fighting. Dr. Redus's report also indicated that D.D.C. scored in the high offender range for violent and aggressive tendencies, planned and extensive criminality, and psychopathic features. As previously discussed, D.D.C.'s recent criminal history includes of three unadjudicated offenses, including unauthorized use of a vehicle, evading arrest or detention, and possession of marijuana. D.D.C.'s assault causing bodily injury to a family member offense was adjudicated. While on probation for the assault offense,

D.D.C. violated multiple conditions of his probation. Williams also testified as to D.D.C.'s gang affiliations, and his over fifty infractions while in custody, which included fights with other individuals in detention.

However, there was also evidence of D.D.C.'s potential for rehabilitation. Dr. Redus testified that D.D.C. scored in the mid-range for treatment amenability and he indicated an openness and willingness to receive help and verbalized that he thought there would be benefits to him if he were to receive help. Dr. Redus concluded that D.D.C. appeared to be treatable with a structured long-term treatment program that would include daily therapy and "24/7" supervision, and that treatment would be more beneficial if designed for D.D.C.'s age group and intellectual ability. Similarly, Dr. Theis concluded that D.D.C. could be rehabilitated with significant psychological or psychiatric intervention and educational opportunities consistent with his intellectual limitations. We note that Dr. Redus's recommendations in her report indicated a risk to the safety of others absent intensive intervention and rehabilitative treatment of D.D.C.:

1. [D.D.C's] presentation suggested that he would be at risk for continued behavior problems that might threaten the safety of others without more intensive intervention and indicated that he needs more supervision and structure in his daily environment such as a secure residential treatment facility. He would need individual and group counseling to assist him in developing more appropriate coping skills. It would also be advisable to provide him with trauma-informed counseling. He would need to be monitored for the presence of increasing depressive symptoms that may require more intervention such as referral to a psychiatrist for a medication evaluation. He would need drug counseling and education to assist him in maintaining sobriety and abstinence from use of mood-altering substances.

27

2. [D.D.C.] would need to continue with his education and might benefit from career counseling to assist him in identifying career/vocational options and programs.

Despite the testimony regarding D.D.C.'s amenability to treatment, there was testimony indicating that the kind of treatment recommended by Dr. Redus and Dr. Theis was unavailable to the juvenile court. Williams testified that Victoria County did not have the resources to accommodate a child convicted at the juvenile level for murder, specifically in relation to the intensity of a program and the amount of structure that D.D.C. would require. Williams further testified that the TJJD would also not be able to provide these services to D.D.C. and would not be a sufficient place for him. Williams explained that TJJD only has a limited length of stay for certain offenses, that the majority of juveniles there would be placed there for violations of their probation or an additional offense committed while already on community supervision. Williams further stated that while TJJD does accept individuals with new offenses that warrant direct placement at TJJD, due to the current structure, the intensity of TJJD's programs would not be sufficient enough for D.D.C. Williams concluded that the juvenile system would not likely be able to rehabilitate D.D.C. and recommended that he be transferred to criminal court based on his history, the number of detentions within his time on probation, his history of aggression, and the seriousness and nature of the murder offense alleged against him. Williams also concluded that the juvenile system would not provide adequate protection of the public because an individual is able to parole out since TJJD cannot hold individuals past their nineteenth birthday.

D.D.C. claims that Williams provided testimony demonstrating the many resources

28

available to assist him in his rehabilitation. During cross-examination, D.D.C. asked Williams if she was aware of the Giddings State School, a facility that D.D.C. purported to be operated by TJJD for capital and serious violent offenders that had special programs to rehabilitate children of D.D.C.'s age. Williams responded that she was not aware. The juvenile court was not required to credit counsel for D.D.C.'s assertions regarding the Giddings State School or its available resources. *See Bell*, 649 S.W.3d at 896 ("[T]he juvenile court, as the fact finder, was the sole judge of witnesses' credibility, could choose to believe or disbelieve a witness's testimony, in whole or in part, and was tasked with weighing the evidence and resolving any inconsistencies."); *Grant*, 313 S.W.3d at 444–45 ( "The trial court is the sole factfinder in a transfer hearing and may choose to believe or disbelieve any or all of the witnesses' testimony."). The record is devoid of any other testimony or evidence about the Giddings State School, or its resources that could rehabilitate D.D.C. In addition, Williams testified that she was generally aware of TJJD facilities that had some of the special programs for certain offenders that counsel for D.D.C. alluded to. However, said testimony does not equate to evidence that those facilities had the resources to rehabilitate D.D.C., and in sum, William's overall testimony was not incompatible with the juvenile court's findings.

The evidence in the record supports the juvenile court's findings that "the prospect of adequate protection of the public and likelihood of rehabilitation of [D.D.C.] by the use of procedures, services and facilities currently available through juvenile court is unlikely." There is more than a scintilla of proof supporting its findings concerning public safety and rehabilitation, and the great weight and preponderance of the evidence is not to the

contrary. *See Bell*, 649 S.W.3d at 893. The evidence is therefore legally and factually sufficient to support the juvenile court's finding that § 54.02(f)(4) weighs in favor of its waiver of jurisdiction. *See* TEX. FAM. CODE ANN. § 54.02(f)(4); *see also Bell*, 649 S.W.3d at 893.

### e. Abuse of Discretion

As demonstrated above, the juvenile court's waiver of jurisdiction is supported by legally and factually sufficient evidence regarding the § 54.02(f) factors. *See* TEX. FAM. CODE ANN. § 54.02(f)(1)–(4). The fact that some of that evidence is conflicting does not render the juvenile court's decision an abuse of discretion. *See In re B.N.F.*, 120 S.W.3d at 877. The record does not support a determination that the juvenile court acted without reference to any guiding rules and principles. *See In re Nat'l Lloyds Ins.*, 507 S.W.3d at 226. On the contrary, the juvenile court's decision was a "reasonably principled application of the legislative criteria" and not arbitrary. *See Bell*, 649 S.W.3d at 887. We hold that the juvenile court did not abuse its discretion when it waived its jurisdiction and transferred D.D.C.'s case to the criminal district court. We overrule D.D.C.'s second sub-issue.

### III. CONCLUSION

Having overruled all of D.D.C.'s issues, we affirm the juvenile court's order waiving jurisdiction.

NORA L. LONGORIA
Justice

Delivered and filed on the
20th day of October, 2022.