Opinion issued April 2, 2026



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-25-00871-CV

## NO. 01-25-00872-CV

———————————

## IN THE MATTER OF C.A.O.

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 2025-01689J and 2025-01692J**

---

## MEMORANDUM OPINION

This is an accelerated appeal from the Harris County Juvenile Court's orders waiving jurisdiction and transferring Appellant—a juvenile respondent—to criminal district court to stand trial as an adult on charges of murder and aggravated assault with a deadly weapon. On appeal, Appellant raises a single

issue with respect to the transfers, arguing that the juvenile court abused its discretion when it admitted a cell phone video that was not properly authenticated.

We affirm the juvenile court's order.

## Background[1]

In July 2025, the State filed two petitions in Harris County Juvenile Court alleging that Appellant—a juvenile respondent born on October 27, 2007 ("C.A.O.")—had engaged in delinquent conduct by committing murder and aggravated assault with a deadly weapon.[2] The State alleged that on October 14, 2024, C.A.O. had "unlawfully, intentionally, and knowingly threatened R.R. with imminent bodily injury by using and exhibiting a deadly weapon," and that on the same day, C.A.O. had "unlawfully, intentionally, and knowingly cause[d] the death of Ivan Gabriel Bernardez . . . by shooting the Complainant with a deadly weapon, namely a firearm."

The State filed a motion in each proceeding requesting that the juvenile court waive its original jurisdiction and transfer C.A.O. to criminal district court to be tried as an adult pursuant to section 54.02(a) of the Texas Family Code. The juvenile court held a hearing on the motions and signed an order in October 2025

---

[1] To protect the identity of minor children, we refer to them by pseudonyms. *See* TEX. R. APP. P. 9.8(c)(2).

[2] The offenses allegedly were committed twelve days before C.A.O.'s seventeenth birthday.

waiving its jurisdiction and transferring C.A.O. to criminal district court for trial on both charges.

Two witnesses testified during the certification hearing.

**Detective Jordan Meister**

Detective Meister of the Houston Police Department's homicide division testified that police were dispatched to a shooting on October 14, 2024, at approximately 8:15 p.m.[3] When the detectives arrived, they found a deceased young Hispanic male lying on the ground with multiple gunshot wounds. The complainant, Ivan Bernardez, was in a "defensive position." According to Detective Meister, seven 5.56 caliber rifle casings and one 9-millimeter casing were recovered from the scene, indicating there were two shooters. No firearms were found at the scene.

The police interviewed witnesses who initially identified four possible suspects. Bernardez was a member of the "Federal Road" or "Fed Block" gang. His gang "had beef" with another gang called 18th Street. The four suspects were members of the 18th Street gang. Detective Meister testified that "multiple witnesses made it seem like [C.A.O.] was the . . . leader of their 18th Street gang."

---

[3] Detective Meister testified that he was not originally involved in the investigation but "inherit[ed]" the case from two other detectives. He became lead detective on the case because he was working on another homicide involving the same witnesses and gangs.

The investigating officers recovered surveillance video from the apartment complex where the shooting occurred, surveillance video from an apartment complex across the street, and a cell phone video related to the assault allegedly committed by C.A.O. earlier in the day involving R.R. The video from the neighboring apartment complex showed two males in dark clothing approaching Bernardez with their arms pointed at him. Detective Meister identified C.A.O. as one of the males depicted and showed him holding a 5.56 rifle. The other male was holding a 9-millimeter pistol. Detective Meister testified, "It appeared like the two suspects were certainly looking for somebody."

The court admitted the surveillance video from the neighboring apartment complex and screen shots taken of the suspects from that video. Detective Meister stated that the clothing in the screen shots matched the clothing seen in the apartment surveillance videos during the murder. According to Detective Meister, "multiple witnesses" identified the males in the screen shots as C.A.O. and E.R.C., a second suspect in the shooting.[4] Detective Meister interviewed several witnesses who corroborated that C.A.O. and E.R.C. were involved in Bernardez's murder.

Detective Meister testified that during his investigation of an unrelated murder involving another member of the Fed Block gang, he interviewed witnesses involved in the present case. In working on the present case, he also re-interviewed

---

[4]     E.R.C. has been charged as an adult co-defendant in Bernardez's murder.

some witnesses who had been interviewed by the original detectives who investigated Bernardez's murder.

Detective Meister then testified about the cell phone video related to the assault allegedly committed by C.A.O. earlier in the day. The cell phone video purportedly was taken from inside the car C.A.O. was traveling in while he allegedly committed the aggravated assault against R.R. Detective Meister was told that a woman named Cindy had recorded the video, but he was not able to locate her. He also could not verify that the video had been recorded on October 14, 2024. However, when Detective Meister interviewed two other people who were in the car allegedly involved in the assault on the day of the shooting, he ascertained that "what they were talking about [was] depicted in [the] [cell phone] video." Detective Meister testified that in the cell phone video, a woman in the car yelled what sounded like, "[C.A.O.], hell yeah."

During the assault, C.A.O. allegedly threatened R.R. by shooting at the car he was in. Others in R.R.'s car identified C.A.O. as the shooter. They said he was using a rifle and that he was sitting behind the driver's seat, both of which were corroborated by the cell phone video.

According to Detective Meister, R.R. was shown surveillance stills and said C.A.O. was wearing the same dark clothing during the assault as he apparently wore during the murder. E.R.C.'s girlfriend, T.A., told Detective Meister that she

was in the same car as C.A.O. during the assault. She identified C.A.O. from the surveillance stills. Detective Meister found her response and identification to be credible.

Detective Meister also interviewed T.A.'s friend, M.V., who was in the car during the assault. M.V. also identified C.A.O. from the stills. She said that during the assault, C.A.O. pulled the rifle out of the backpack he appeared to be wearing in the screen shots from the apartment surveillance video. Detective Meister also testified that C.A.O.'s ex-girlfriend and two others identified C.A.O. from the surveillance stills.

Detective Meister testified that he interviewed four members of the 18th Street gang. One of them, E.P., provided the car that dropped off C.A.O. and the other suspect at the apartment complex where Bernardez was killed. The car belonged to E.P.'s mother. E.P. identified the suspects from the still shots.

Detective Meister also interviewed E.R.C.—C.A.O's co-defendant in Bernardez's murder. E.R.C. told Detective Meister that C.A.O. used a rifle during the murder, and that while they both raised their guns at Bernardez, only C.A.O. fired at him. Detective Meister noted that the surveillance video from the apartment complex across the street showed muzzle fire from only one firearm during the murder.

E.R.C. also said that he was driving the car involved in the alleged assault of R.R.  He stated there had been "prior issues" between the 18th Street and Fed Block gangs. The car R.R. was traveling in during the assault was a Fed Block vehicle. E.R.C. told Detective Meister he did not know C.A.O. was going to fire at the Fed Block car but that C.A.O. "did eventually fire the rifle at [R.R.'s] vehicle."

Detective Meister testified about "multiple similarities" between Bernardez's murder and R.R.'s assault: both involved the same gangs, C.A.O was involved in both incidents, and the weapon used was the same in both incidents.[5] He said C.A.O. was known for using the rifle. Detective Meister testified that he believes the assault and the murder were the result of "deliberate targeting."

During the investigation, Detective Meister obtained C.A.O.'s Instagram records and a forensic extraction of his cell phone. A picture in C.A.O.'s Instagram account appeared to be C.A.O. holding two rifles and wearing the same clothes as in the apartment complex surveillance video. A photo from C.A.O.'s cell phone shows him holding a rifle.

When C.A.O. was arrested, he had a fully-loaded rifle magazine on him. His rifle was not recovered. According to Detective Meister, authorities recovered 5.56 rifle rounds from Bernardez during his autopsy.

---

[5] The testimony that the same weapon was used in the aggravated assault and the murder was the result of a finding made by NIBIN, a system that compares the unique marks a firearm makes when a bullet is fired and a shell casing is expended.

Detective Meister interviewed people from both gangs, as well as people without gang affiliation, who identified C.A.O. as the shooter. He testified that no one other than C.A.O. (1) had the motive to kill Bernardez, (2) had a NIBIN finding lead back to an aggravated assault in which people identified him as the shooter, (3) was identified by multiple people in a surveillance video as being in the area before the murder, and (4) was identified by a co-defendant as being the shooter in this case. He testified that he believes C.A.O. and E.R.C. killed Bernardez.

**Dr. Alexandra Tellez-Caruso**

Dr. Tellez-Caruso, a psychologist for the Harris County Juvenile Probation Department, testified that she conducted a certification evaluation on C.A.O. She concluded that (1) he fell in the high end of the middle range for dangerousness when you include the two charged offenses; (2) his intellectual sophistication is below average; (3) his criminal sophistication is moderately high when you include both of the charged offenses; (4) his maturity is moderately high; (5) he shows moderately low treatment amenability when you include the two charged offenses; and (6) when you include the charged offenses, he has a moderately high risk for violently re-offending.

At the conclusion of the certification hearing, the court found probable cause for the offenses and, "based on the seriousness of the offense and the welfare of the

8

community," the court waived its jurisdiction and ordered C.A.O. to be tried in the adult criminal system.

This appeal ensued. In his sole issue, Appellant argues the juvenile court erred in admitting the cell phone video because it was not properly authenticated.

**Transfer to Adult Criminal District Court**

Section 54.02 of the Texas Family Code governs transfers by a juvenile court to a criminal district court for criminal proceedings. Under Section 54.02(a), a juvenile court may waive its exclusive original jurisdiction and transfer a child[6] to a criminal district court if:

(1)    the child is alleged to have violated a penal law of the grade of felony;

(2)    the child was:

    (A)    14 years of age or older at the time he is alleged to have committed the offense, if the offense is . . . a felony of the first degree, and no adjudication hearing has been conducted concerning that offense; [and]

. . .

(3)    after a full investigation and a hearing, the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense alleged or the background of the child the welfare of the community requires criminal proceedings.

---

[6] In this context, "child" is defined as someone is "ten years of age or older and under 17 years of age." TEX. FAM. CODE §51.02(2)(A).

TEX. FAM. CODE § 54.02(a); *see Bell v. State*, 649 S.W.3d 867, 886 (Tex. App.—

Houston [1st Dist.] 2022, pet. ref'd).

The State has the burden to persuade the juvenile court by a preponderance

of the evidence that the community's welfare requires transfer of jurisdiction over

the child for criminal proceedings, either because of the seriousness of the offense

alleged, the background of the defendant, or both. *Bell*, 649 S.W.3d at 886 (citing

*In re A.K.*, No. 02-20-00410-CV, 2021 WL 1803774, at *19 (Tex. App.—Fort

Worth May 6, 2021, pet. denied) (mem. op.)). In considering whether the

preponderance of the evidence supports transfer under Section 54.02(a)(3), the

juvenile court must consider, among other things, the following non-exclusive

factors:

(1)     whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

(2)     the sophistication and maturity of the child;

(3)     the record and previous history of the child; and

(4)     the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

TEX. FAM. CODE § 54.02(f); *see also Bell*, 649 S.W.3d at 886 (citing *In re Z.T.*, No.

05-21-00138-CV, 2021 WL 3645103, at *8 (Tex. App.—Dallas Aug. 17, 2021,

pet. denied) (mem. op.)). "Any combination of these factors may suffice to support

a waiver of the juvenile court's exclusive original jurisdiction and not every factor need weigh in favor of transfer[.]" *Bell*, 649 S.W.3d at 886 (citing *In re B.M.*, No. 01-18-00898-CV, 2019 WL 1388561, at *7 (Tex. App.—Houston [1st Dist.] Mar. 28, 2019, no pet.) (mem. op.)). "The juvenile court need not consider any other factors, nor need it find that the evidence establishes each factor." *Bell*, 649 S.W.3d at 886-87 (citing *In re Z.M.*, No. 02-21-00213-CV, 2021 WL 4898851, at *1 (Tex. App.—Fort Worth Oct. 21, 2021, no pet.) (mem. op.)). The factors are intended to be "non-exclusive guides" to help the juvenile court determine whether reason for transfer exists. *Bell*, 649 S.W.3d at 887 (citing *In re Z.T.*, 2021 WL 3645103, at *8).

### Standard of Review[7]

We review a juvenile court's ruling to admit or exclude evidence at a waiver and transfer hearing for an abuse of discretion. *In re C.P.C.*, No. 01-24-00672-CV, 2025 WL 2956226, at *2 (Tex. App.—Houston [1st Dist.] Oct. 21, 2025, no pet.) (mem. op.) (citing *In re A.W.*, 661 S.W.3d 547, 552 (Tex. App.—Houston [14th Dist] 2023, pet. denied)). An abuse of discretion occurs if the court's ruling is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Id.* (citing *In re H.Y.*, 512 S.W.3d 467, 473 (Tex. App.—Houston [1st

---

[7] Appellant does not challenge the sufficiency of the evidence supporting the juvenile court's order. He only makes a challenge to the admission of the cell phone video during the transfer hearing.

11

Dist.] 2016, pet. denied)). Even if a trial court errs in admitting evidence, any error is cured if the same evidence is admitted elsewhere without objection. *In re H.Y.*, 512 S.W.3d at 473 (citing *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003)). Reversal is warranted only "where the error probably caused the rendition of an improper judgment." *In re C.P.C.*, 2025 WL 2956226, at *2 (citing *In re A.W.*, 661 S.W.3d at 552).

## Discussion

### A.    Application of the Rules of Evidence to Transfer Hearings

C.A.O. argues that the Texas Rules of Evidence apply to transfer hearings. TEX. FAM. CODE § 51.17(c). The State disagrees, arguing that evidentiary rules are not strictly applied in juvenile certification hearings.

We recently noted that "[t]here appears to be no published opinion that indicates whether the Texas Rules of Evidence . . . appl[y] to juvenile transfer proceedings pursuant to section 51.17(c) of the Texas Family Code." *In re C.P.C.*, 2025 WL 2956226, at *3. We observed, however, that Texas appellate courts "have characterized transfer proceedings as dispositional and not adjudicational, allowing for the admission of hearsay statements and testimonial statements from witnesses who are not present." *Id.* (citing cases).[8] This Court also has held that "a

---

[8]    *See, e.g.*, *L.M.C. v. State*, 861 S.W.2d 541, 542 (Tex. App.—Houston [14th Dist.] 1993, no pet.) (holding rights to confrontation not violated where evidence is not used to adjudicate guilt or innocence).

juvenile court is not required to rule on the admissibility of evidence during a transfer hearing." *In re H.Y.*, 512 S.W.3d at 474 (citing *Navarro v. State*, Nos. 01–11–00139–CR & 01–11–00140–CR, 2012 WL 3776372, at *6 (Tex. App.–Houston [1st Dist.] Apr. 17, 2013, pet. ref'd) (mem. op., not designated for publication)). In *Navarro*, we held that:

> At a transfer and certification hearing, a juvenile court need only determine if there is "probable cause" that the juvenile committed the charged offense. The transfer and certification hearing is a nonadversary preliminary hearing, in which the juvenile court may rely upon hearsay as well as written and oral testimony. A transfer hearing "does not require the fine resolution of conflicting evidence that an adjudication of guilt or innocence requires"; the hearing's only goal is to determine the proper forum in which to adjudicate the defendant's guilt or innocence.

2012 WL 3776372 at *5 (internal citations omitted). *See also generally State v. Lopez*, 196 S.W.3d 872, 874 (Tex. App.—Dallas 2006, pet. ref'd) ("The [transfer] hearing is comparable to a criminal probable cause hearing and the court need not resolve evidentiary conflicts beyond a reasonable doubt.") (citing *In re K.B.H.,* 913 S.W.2d 684, 689 (Tex. App.—Texarkana 1995, no writ)).[9]

---

[9] *See State v. Lopez*, 196 S.W.3d 872, 874 (Tex. App.—Dallas 2006, pet. ref'd) ("The United States Supreme Court has recognized that although a juvenile court hearing to determine whether to waive jurisdiction and transfer a juvenile for trial as an adult is subject to essentials of due process and fair treatment, it is not required to conform to all of the requirements of a criminal trial or even of the usual administrative hearing.") (citing *Kent v. United States,* 383 U.S. 541, 562 (1966)).

.

Indeed, there are numerous cases that hold that a juvenile court may consider hearsay in transfer hearings. *See, e.g.*, *In re C.P.C.*, 2025 WL 2956226, at *2 ("Because a juvenile transfer hearing is dispositional rather than adjudicational in nature, a juvenile court may consider hearsay without violating the juvenile's right to confrontation."); *In re B.M.*, 2019 WL 1388561, at *13 ("[B]ecause the transfer hearing is a nonadversary preliminary hearing, the juvenile court may rely upon hearsay as well as written and oral testimony in making its probable-cause findings."); *In re A.W.*, 661 S.W.3d at 554 ("[A] juvenile court in a transfer hearing is not required to resolve the admissibility of hearsay evidence offered against the juvenile because of the non-adversarial nature of a transfer hearing."); *Grant v. State*, 313 S.W.3d 443, 444 (Tex. App.—Waco 2010, no pet.) ("The juvenile court can determine probable cause in a nonadversary preliminary hearing through the use of hearsay besides written and oral testimony."); *McKaine v. State*, 170 S.W.3d 285, 289 (Tex. App.—Corpus Christi–Edinburg 2005, no pet.) (holding juvenile court could consider hearsay evidence because "[s]trict rules of evidence are not applied in transfer proceedings.").

We have not found, nor has Appellant cited, any case applying the Rules of Evidence when, as here, the authentication of a video or some other type of evidence is at issue. We need not resolve the issue, however, because even if the

Rules of Evidence were applicable, they would not affect our disposition of the appeal.

## B. Authentication of the Cell Phone Video

During the transfer hearing, C.A.O. objected to the admission of the cell phone video, which purportedly was made from inside the car when C.A.O. allegedly shot at R.R. C.A.O. argued in the trial court that Detective Meister—the sponsoring witness—had not authenticated the video because there was no time stamp on it and he did not know definitively who had recorded the video or whether it had been altered.

On appeal, C.A.O. argues the video was not properly authenticated because it did not comply with Texas Rule of Evidence 901, which requires the offering party "to produce evidence sufficient to support a finding that the item is what the proponent claims it is." TEX. R. EVID. 901(a). C.A.O. notes that while the State attempted to authenticate the cell phone video through Detective Meister's testimony, Detective Meister did not make the video, had no personal knowledge of when or where the video was taken, and did not speak with "Cindy," the person who allegedly recorded the video. Further, the State did not call Cindy or any other occupant of the car to testify about the circumstances under which the video was recorded.

Detective Meister testified during the hearing that he was told the video was recorded on October 14, 2024, but he could not verify that information. He testified, however, that "multiple witnesses—all of whom were inside the" car when the cell phone video was recorded—told him "that was the date it happened." Detective Meister testified that, after interviewing two people who were riding in the car with C.A.O. when the video was recorded, he was able to determine that their description of the assault matched what was depicted in the video. According to Detective Meister, during the video the two witnesses called out C.A.O.'s name as C.A.O. was shooting at the assault complainant.

Based on Detective Mesiter's testimony, the State told the court that it had "established that this evidence is what it purports to be, a cell phone video of what happened inside of that car that is corroborated by the witnesses who [were] inside of that vehicle." On appeal, the State relies on *Fowler v. State*, 544 S.W.3d 844 (Tex. Crim. App. 2018) in support of its argument that the cell phone video was sufficiently authenticated. In *Fowler*, the Court of Criminal Appeals observed:

> [E]ven though the most common way to authenticate a video is through the testimony of a witness with personal knowledge who observed the scene, *that is not the only way*. Evidence can also be authenticated by "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."

*Id.* at 849 (emphasis in original) (quoting TEX. R. EVID. 901(b)(4)). *Fowler* stemmed from a dispute regarding the authenticity of a surveillance video from a

16

Family Dollar store where the appellant shopped prior to committing theft of an ATV. The store's video could not be copied, so an investigating officer recorded a copy of the video. *Id.* at 846. There was no audio on the video. *Id.*

At trial, defense counsel objected to the video's admission because it was an incomplete copy of a recording and the State had not established why the original was not available. *Id.* The trial court admitted the video. *Id.* at 847. The court of appeals held the trial court erred in admitting the video, but the Court of Criminal Appeals reversed, holding the video had been properly admitted because it is possible to prove the authenticity of a video "without the testimony of someone who either witnessed what the video depicts or is familiar with the functioning of the recording device." *Id.* at 848. The Court held that while the State could have produced testimony from witnesses who would have further authenticated the video, the trial court's determination that the police officer sufficiently authenticated the video was a decision within the zone of reasonable disagreement. *Id.* at 850. It further held that "[c]onclusive proof of authenticity before allowing admission of disputed evidence is not required. Rule 901 'merely requires some evidence sufficient to support a finding that evidence in question is what the

proponent claims.'" *Id.* at 848 (citing *Reed v. State*, 811 S.W.2d 582, 587 (Tex. Crim. App. 1991)).[10]

Consistent with *Fowler*, the El Paso Court of Appeals recently admitted a cell phone video even though the person who recorded the footage did not authenticate it. *Gonzalez v. State*, No. 08-23-00306-CR, 2024 WL 4189237, at *4 (Tex. App.—El Paso Sept. 13, 2024, no pet.) (mem. op., not designated for publication). In *Gonzalez*, a bystander took cell phone video of an assault on the complainant at a bus stop. 2024 WL 4189237, at *1. The bystander did not testify. *Id.* at *2. During the trial, the defendant objected to the admission of the video, arguing that only the person who recorded the video could say what he was doing when he made the video, where he was located when the video was made, whether his camera was working properly, and whether he deleted any part of the video. *Id.* The complainant watched the cell phone footage and testified that the video fairly and accurately depicted her assault and that she saw herself and the defendant in the video. *Id.* She testified she did not believe the video had been altered. *Id.* The trial court admitted the video. *Id.*

On appeal, the defendant argued the cell phone video was inadmissible because the complainant "could not verify any details about the production of the

---

[10]     *See generally Butler v. State*, 459 S.W.3d 595, 601 (Tex. Crim. App. 2015) (observing that text messages can be authenticated by witness who observes author type and/or send message, or by witness who knows text message came from phone number associated with purported sender).

footage, including whether it had any additions or deletions," and that only the person who made the video could authenticate it under Rule 901. *Id.* at \*2, 4. In addition, according to the appellant, the video "move[d] away from the action and back again." *Id.* at \*4. The court disagreed, holding that "the trial court need not be convinced that the item is authentic; it need only determine that a reasonable juror could find that the item is authentic." *Id.* at \*3 (citing *Watson v. State*, 421 S.W.3d 186, 190 (Tex. App.—San Antonio 2013, pet. ref'd)). The court held that because the complainant testified the video accurately showed what happened during the assault, the trial court had not abused its discretion in admitting the video. *Id.* at \*4.

The *Gonzalez* court relied in large part on *Hines v. State*, 383 S.W.3d 615 (Tex. App.—San Antonio 2012, pet. ref'd), where a defendant argued that a police officer's dashboard camera video should not have been admitted because it was not properly authenticated. *Id*. at 624. The defendant in *Hines* argued the video footage could not be authenticated by the police officer who sponsored the video because he could not verify whether the video had been altered in any way, and because the sponsoring officer did not make the video, given that it was recorded by another officer's camera. *Id.* Holding that the officer could authenticate the video—which the court identified as a "jumbled mess" because the camera did not operate correctly—the court of appeals explained that a witness is not "required to be the maker of the recording or have otherwise participated in the conversation in order

19

for his testimony that the recording is what it is claimed to be to sufficiently authenticate it." *Id.* at 624–25 (citing *Angleton v. State,* 971 S.W.2d 65, 69 (Tex. Crim. App. 1998)).

While all of these cases are illustrative, we find that *Fowler* is the most persuasive. The juvenile court's admission of the cell phone video in the present case was a decision within the zone of reasonable disagreement. As the Court of Criminal Appeals stated in *Fowler*, "Rule 901 'merely requires some evidence sufficient to support a finding that evidence in question is what the proponent claims.'" 544 S.W.3d at 848 (citation omitted). Detective Meister provided "some evidence" to authenticate the cell phone video. He testified that others traveling in the car when the video was recorded told him that the video depicted the circumstances of the assault. He also testified that after he interviewed several witnesses, he "was able to ascertain that what was on this cell phone video [was] a fair and accurate depiction of what actually happened in this aggravated assault." The State was not required to produce those witnesses. As we previously explained, a juvenile court may rely on hearsay during a transfer hearing, and Detective Mesiter's testimony, while based on hearsay, sufficiently authenticated the video. We conclude the trial court did not err in admitting the cell phone video.

## C.    Harm

Even if the juvenile court erred in admitting the cell phone video, we

conclude the error was harmless. We can only reverse a juvenile court's order waiving jurisdiction if the error "probably caused the rendition of an improper judgment." *In re C.P.C.*, 2025 WL 2956226, at *3 (citing TEX. R. APP. P. 44.1(a)(1)); *see In re A.W.*, 661 S.W.3d at 554 (holding no harm demonstrated when there was "an abundance of evidence to support the trial court's finding").

C.A.O. argues that the admission of the cell phone video was harmful because the State's case "relied heavily on Detective Meister's testimony regarding statements made by people who did not testify and were not subject to cross-examination to test their veracity or bias." He argues that the only physical evidence that connected the assault to the murder was the presence of 5.56 shell casings that may have come from the same gun, which was not found. He avers that "[i]n the absence of live witnesses that could testify that they saw C.A.O. fire that gun, the cell phone video was the State's best evidence of a connection between C.A.O. and the gun that was necessary to support a finding of probable cause."

The State responds that there was an "abundance of evidence" in addition to the cell phone video to support the trial court's finding that C.A.O. should be tried as an adult. We agree.

First, the State proffered surveillance video from the apartment complex across the street from where the shooting occurred. The State argues that the

apartment video and still shots from the video placed C.A.O. at the scene of the homicide. Further, Detective Meister testified that "multiple witnesses"—including members of the 18th Street gang, members of the Fed Block gang, and people who did not belong to either gang—identified C.A.O. as the person who approached Bernardez while holding a rifle.

Second, the State presented testimony identifying C.A.O. as the person who held the rifle that killed Bernardez. Witnesses from the assault that occurred hours before the murder identified C.A.O. from the surveillance video and confirmed that he wore the same clothing during the assault and the murder. Further, E.P. told police that on the day of the murder, he gave C.A.O. and E.R.C. a ride to the apartment complex where Bernardez was killed and picked them up there later.

Third, the State argues that there was evidence that the rifle C.A.O. held in the photos was the rifle used to kill Bernardez. The State presented evidence that NIBIN indicated the same rifle was used in the assault and the murder. And the surveillance video that captured the murder showed muzzle fire only from the gun that one of the shooters was holding when the murder occurred. E.R.C. also told Detective Meister that he and C.A.O. were armed when they confronted Bernardez, that both raised their weapons, but that only C.A.O fired his rifle at Bernardez.

Fourth, Dr. Tellez-Caruso testified that, among other things, C.A.O. was in the high end of the middle range for dangerousness, he showed moderately low

22

treatment amenability, he had a moderately high criminal sophistication and maturity, and he had a moderately high risk for violently re-offending.

Finally, the State argues that any evidence from the cell phone video was cumulative, as it did not contain any information that was not elicited during Detective Meister's testimony. Detective Meister testified that during his witness interviews, he learned that C.A.O. was wearing all black and sitting behind the driver's seat when he fired his rifle during the assault. The video from the neighboring apartment complex, which was admitted without objection, showed what C.A.O. wore the night the assault and murder were committed, which matched the description of what Detective Meister learned about the murder suspect during his witness interviews. And C.A.O. did not object to the admission of an Instagram photo that showed him holding a rifle and wearing the same jacket he apparently wore in the surveillance video.

We conclude the admission of the cell phone video did not lead to the rendition of an improper judgment. We overrule C.A.O.'s sole issue.

**Conclusion**

We affirm the juvenile court's orders transferring C.A.O.'s cases to criminal district court.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.